**Louise TODARO et al., Plaintiffs,**

v.

**Benjamin WARD, Commissioner of the New York State Department of Correctional Services, et al., Defendants.**

**No. 74 Civ. 4581.**

United States District Court, S. D. New York.

April 25, 1977.

---

The Legal Aid Society, Prisoners' Rights Project, New York City, for plaintiffs; Eric R. Neisser, Ellen J. Winner, Warren H. Richmond, III, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., New York City, for defendants; Arlene R. Silverman, New York City, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

This civil rights class action under 42 U.S.C. § 1983 and 28 U.S.C. § 1343 challenges the delivery of medical care at the Bedford Hills Correctional Facility (hereinafter "Bedford Hills"). Plaintiffs, who represent a class consisting of all persons who are or will be confined at Bedford Hills, seek (1) a declaratory judgment that the medical care provided at Bedford Hills violates their rights under the eighth and fourteenth amendments to the United States Constitution, and (2) an injunction against future violations of their constitutional rights. Named as defendants are: the ·Commissioner of Correctional Services; the Assistant Commissioner for Health Services of the New York State Department of Corrections (Dr. Loudon); the Southern Regional Director of Health Services of the New York State Department of Corrections (Dr. Frost); the Superintendent of Bedford Hills; the Health Services Director of Bedford Hills (Dr. Williams); the Nurse Administrator of Bedford Hills (Ms. Daly); and a surgical consultant (Dr. Tschorn), who, prior to the arrival of a full-time Health Services Director, performed some of the functions of this position.

Plaintiffs contend that the medical system is unconstitutionally defective in the following respects: first, admission health screening, including x-ray reports, is substantially delayed, and the admission screening procedure includes improper reliance on dangerous equipment (antiquated x-ray machine) and techniques (catheterization); second, access to primary care physicians is denied or substantially delayed as a result of the lobby clinic procedures for screening and record keeping; third, patients in sick wing endure unnecessary suffering and are subjected to undue risk of harm because inadequate facilities, especially communication facilities, result in inadequate observation of seriously ill patients; fourth, diagnostic work ordered by a physician is not done at all, or is not done within a reasonable period after being ordered, or when done there are delays in reporting the results and abnormal results are not followed up in a timely fashion; fifth, as a result of poor procedures and poor communication, follow-up medical appointments are not kept or are not scheduled; sixth, the chronically ill are inadequately monitored; seventh, as a result of failure to follow-up, inmates are given medically inappropriate work assignments; eighth, access to outside specialists is denied or de-

layed; and finally, access to outside consultations for elective surgery is denied or delayed.

## THE LAW

■ Federal district courts, being courts of limited jurisdiction, can act upon complaints from state prisoners concerning the conditions of their confinement only when rights guaranteed by the United States Constitution are infringed. 42 U.S.C. § 1983; 28 U.S.C. § 1343(3); see *Wilwording v. Swenson,* 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971) (per curiam); cf. *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam); *Johnson v. Glick,* 481 F.2d 1028 (2d Cir. 1973). In addition to this jurisdictional limitation, when a federal court is asked to intervene in the administration of a state prison, the notion of comity, or due regard for the state's sovereignty over its own internal affairs, places another constraint on the federal courts. *Preiser v. Rodriguez,* 411 U.S. 475, 490–92, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). Moreover, federal courts have traditionally approached prison litigation with restraint, recognizing

> that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.

*Procunier v. Martinez,* 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974) (footnote omitted).

Thus, federal intervention into the internal affairs of prisons has been limited and reluctant.

However, federal courts are empowered to act whenever constitutional rights are infringed. Judicial restraint counsels caution, but not the abdication of judicial responsibility for the enforcement of constitu-

tional rights. *Procunier v. Martinez, supra* at 405, 94 S.Ct. 1800.

■ It cannot now be doubted that the denial of medical care to a state prisoner constitutes a violation of the eighth amendment, made applicable to the states by the fourteenth amendment. *E. g., Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Bishop v. Stoneman,* 508 F.2d 1224 (2d Cir. 1974); *Newman v. Alabama,* 503 F.2d 1320 (5th Cir.), cert. denied, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1974); *Fitzke v. Shappell,* 468 F.2d 1072 (6th Cir. 1972). It also cannot be doubted that medical care is not denied unconstitutionally by "an inadvertent failure to provide adequate medical care" or by "negligent . . . diagnosing or treating [of] a medical condition." *Estelle v. Gamble, supra* at 105–06, 97 S.Ct. at 292; see, e. g., *Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir. 1972); *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864 (2d Cir. 1970). Rather, the standard for determining whether there has been an unconstitutional denial of medical care is whether there has been "deliberate indifference to a prisoner's serious illness or injury." *Estelle v. Gamble, supra* at 105, 97 S.Ct. at 291; *Corby v. Conboy, supra;* see *Williams v. Vincent,* 508 F.2d 541 (2d Cir. 1974); *Startz v. Cullen,* 468 F.2d 560, 561–62 (2d Cir. 1972); *Martinez v. Mancusi,* 443 F.2d 921 (2d Cir. 1970), cert. denied, 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335 (1971).

What constitutes deliberate indifference can be gleaned from precedent. Cases which apply this standard generally fall into two categories. First, there are those cases which have held unconstitutional denied or unreasonably delayed access to a physician for diagnosis and treatment of physical conditions which, although not life-threatening or likely to result in permanent disability, cause discomfort. For example, in *Corby v. Conboy, supra,* denial of access to a physician for diagnosis and treatment of an allegedly serious nasal disorder was held to state a claim. In *Miller v. Carson,* 401 F.Supp. 835, 878 (M.D.Fla.1975), the court found "shocking" a two-week delay in

providing access to a physician for diagnosis and treatment of an earache which proved to result from an ear infection. *See also Bishop v. Stoneman, supra; Fitzke v. Shappell, supra; Hughes v. Noble,* 295 F.2d 495 (5th Cir. 1961).

The second category of cases which apply the deliberate indifference standard includes those in which the treatment prescribed by a physician was not administered. In *Martinez v. Mancusi,* 443 F.2d 921 (2d Cir. 1970), *cert. denied,* 401 U.S. 983, 91 S.Ct. 1202, 28 L.Ed.2d 335 (1971), a prisoner who had undergone surgery alleged that he was removed from a hospital and returned to prison in contravention of his physician's orders that he remain lying down, moving his legs as little as possible. He further alleged that he was denied medication prescribed for his pain. The court held these allegations sufficient to state a claim of unconstitutional denial of medical care. *See also Campbell v. Beto,* 460 F.2d 765 (5th Cir. 1972); *Tolbert v. Eyman,* 434 F.2d 625 (9th Cir. 1970); *Edwards v. Duncan,* 355 F.2d 993 (4th Cir. 1966); *Derrickson v. Keve,* 390 F.Supp. 905 (D.Del.1975).

In summary, then, to prove an individual claim of unconstitutional denial of medical care it is necessary to show either denied or unreasonably delayed access to a physician for diagnosis or treatment of a discomfort-causing ailment, or failure to provide prescribed treatment.

As will be detailed later, plaintiffs' proof would sustain, under the above standards, an individual's claim of unconstitutional denial of medical care. The instant case, however, involves not an individual claim for relief, but rather an institution-wide challenge to all aspects of a system of medical care delivery. Thus, the question posed by this case is at what point do individual failures in the overall operation of a prison medical care system add up to deliberate indifference which would render the entire system unconstitutional?

The Second Circuit case of *Bishop v. Stoneman, supra,* involved a challenge to the medical care delivery system of an entire institution. There the court concluded that "[a] series of incidents closely related in time . . . may disclose a pattern of conduct amounting to deliberate indifference to the medical needs of prisoners," which would constitute an unconstitutional denial of medical care. 508 F.2d at 1226. Alternatively, the court held that deliberate indifference may be proven by evidence that "the medical facilities were so wholly inadequate for the prison population's needs that suffering would be inevitable." *Id.*

In applying these two tests of deliberate indifference to the present case, the Bedford Hills medical care system must be evaluated in context, *i. e.,* as a health care system within a prison. One factor which must be considered is that the prisoner, "*restrained by the authority of the state, . . . cannot himself seek medical aid.*" *Fitzke v. Shappell, supra* at 1076 (emphasis in original). Consequently, "[a]n inmate must rely on prison authorities to treat his medical needs;" *Estelle v. Gamble, supra* at 103, 97 S.Ct. at 290.

One important consequence of this is that demands upon a prison health care system are going to be substantial. For example, Bedford Hills' inmates cannot self-treat minor ailments such as headaches, upset stomachs, or colds. Nor can they just remain in bed when they feel ill, for they are allowed only two days of room rest a month. Thus, when due to a minor ailment an inmate is not feeling well enough to carry on her daily routine, she must turn to the medical care system even though requiring no more treatment than an aspirin or a day in bed.

Another consequence of inmate dependence is that the prison health care system must provide the full gamut of health care services, from treatment for minor, routine instances of illness to more esoteric specialty care.

Another consideration, testified to by one of plaintiffs' experts, is that there is a higher incidence of medical problems among prisoners than in a similarly aged unincarcerated population. Indeed, one factor which repeatedly impressed the court as it reviewed plaintiffs' medical records

was the extent to which Bedford Hills inmates suffered from serious medical conditions. This factor, too, influences the demand for medical services and affects the determination of what should be deemed adequate.

On the one hand, then, the court recognizes the somewhat unique demands for medical services at Bedford Hills and appreciates the need for judicial restraint before interfering with the administration of a state prison. On the other hand, provision of essential medical care, unlike prison discipline, does not fall within the sphere of correctional concern to which great deference is due. *Newman v. Alabama, supra* at 1328–30.

Against the foregoing legal background, the Court now turns to the facts of this case and the application of the constitutional standards thereto.

## BACKGROUND FACTS

Bedford Hills, located at Bedford Hills, New York and operated by the New York State Department of Correctional Services ("the Department"), is a medium security prison for the confinement of all women prisoners who are sentenced and committed to the custody of the Department but are not on work release or committed to the facility for the criminally insane. The approximately 380 women at Bedford Hills are housed primarily in three residence buildings known as "112," "113," and "114." In addition, there is a "hospital" building, which houses some inmates, a segregation and reception building, an administration building and an industry building.

The health services at Bedford Hills are located principally in the "hospital" building, which is within a five or six minute walk of the residences. Although known as the hospital building, it is not certified as a general hospital and defendants do not use it as such. The first floor contains the main ambulatory care clinic which consists of two physicians examining rooms, a medication station, laboratory, x-ray room, pharmacy, dentist's office, and the administrative office of the medical staff. The remainder of the first floor and the corridor of the floor above it constitutes the infirmary or "sick wing."

The medical staff at Bedford Hills as of the time of trial consisted of eight nurses, the nurse administrator, one full-time physician, one part-time gynecologist, a laboratory technician, a part-time pharmacist, and a part-time x-ray technician. There is also a medical clerk and stenographer. The Bedford Hills medical staff is supplemented by consultants and outside hospital facilities.

The nursing staff is the crucial link in the chain of health care delivery at Bedford Hills. The nurses run the lobby clinic,[1] prepare the physician appointment schedules, call patients to the clinic for doctors' appointments, conduct rounds of the reception, segregation, and hospital buildings, and assist during all physical examinations. In fact, physicians cannot see patients unless a nurse is available. In addition, nurses respond to emergency calls from the corrections officers and handle routine health care inquiries. Nurses also conduct the initial interview and screening of new admissions to Bedford Hills. Also, prior to October 31, 1974, the nurses had to prepare all of the individual prescriptions because there was no pharmacist.[2] In short, the

1. See section III *infra*, where the lobby clinic is described.

2. The dispensing of prescription drugs by nurses violated state law. As early as 1973, the Joint Commission on Accreditation of Hospitals had informed the administration of Bedford Hills that the nurses were performing an unlawful function and recommended the hiring of a part-time pharmacist. A year passed before a pharmacist was hired and then, only when Ms. Daly, Nurse Administrator, served notice that she would no longer fill doctors' prescriptions. For the first three months, the pharmacist's performance was hampered by the lack of pharmacy facilities.

The amount of nurse time consumed by just this one function is indicated by the fact that the part-time pharmacist soon found it impossible to keep up with the prescriptions during the hours she was at the facility.

health care delivery system at Bedford Hills could not operate without the nurses.

Ms. Daly, the Nurse Administrator, testified that to perform these duties she required, at a minimum, two nurses on the day shift (8:00 A.M. to 4:00 P.M.), two on the evening shift (4:00 P.M. to 12:00 P.M.), and one on the night shift (midnight to 8:00 A.M.). She further testified that barring complications she could accomplish this with eight nurses. However, Ms. Daly recognized that nurses' illnesses, vacations, and the like interfere with the coverage which she deems minimally adequate. For example, on December 2, 1975, when Ms. Daly had nine nurses, the night nurse was ill and there was no coverage of the midnight to 8:00 A.M. shift. On December 4, there was only one nurse on the day shift and one for a portion of the evening shift. It was apparent to the Court at the time of trial, which began on January 12, 1976, that eight nurses could not provide continuous medical coverage seven days a week. For example, on January 12 and 16, 1976, there was only one nurse on the evening shift, and for the weeks of January 5 through 11 and 12 through 18, there was no night coverage two days a week.

Prior to the fall of 1974, however, Ms. Daly had only six nurses. As a consequence, even when all six worked, there was only one nurse on the evening shift four days a week, and the night shift was not covered two nights a week. Vacations and illnesses further reduced the coverage. In the fall of 1974, one and one-half nurse positions were loaned to Bedford Hills by another institution. However, due to resignations, by April 1975 only one half-time and six full-time nurses remained. The vacancies were not filled until the fall of 1975.

Dr. Frost in a May 20, 1975 report to Dr. Loudon stated that upon visiting Bedford Hills he found a severe nursing shortage to be a key problem. He described the effect on the medical program as follows:

We find that a weak link in the flow of patient care is the lack of nursing personnel. This shortage of nursing personnel is particularly important to this program that relies heavily on part-time physicians to provide the clinical services. Such physicians have outside demands that are priority items to them. Hence, the [Correctional Facility] must have some degree of flexibility to utilize their services at times when they can report to the [Correctional Facility]. With a shortage of nurses, the flexibility is minimal with the result that the program constantly falls behind in physician services.

In a memorandum of August 25, 1975, Dr. Frost further informed Dr. Loudon that the shortage of nurses was resulting in a limitation of physician services in that physician hours had to be cancelled due to the unavailability of nurses to assist the doctors.

Dr. Williams himself testified that he was operating with a skeletal staff. He indicated that when fully staffed he barely had enough nurses.

Thus, the defendants admit that, on occasion, they have found the nursing staff inadequate.

Physician services at Bedford Hills have varied widely in the approximately two and one-half years examined in this lawsuit. In the fall of 1973, Dr. Schoenberger was the Facilities Health Services Director. Although employed full-time at the institution, he apparently did not spend the required thirty-five hours a week there. Dr. Schoenberger was assisted by Dr. Tschorn, who saw patients approximately one and one-half to two hours a day, and by Dr. Kones.

Dr. Kones was the next Facilities Health Services Director. As such, he spent about two to four hours daily at the institution. Dr. Tschorn continued to see patients for about one and one-half to two hours a day during this time. Dr. Kones resigned in June 1974.

From June 1974 until Dr. Williams assumed the position in September 1974, Bedford Hills was without a Health Services Director and full-time physician. Dr. Tschorn continued to see patients and Drs. Enders and Yu provided additional physician coverage.

As of the time of trial, Dr. Williams continued to hold the position of Health Services Director, and spent about five to six hours a day, five days per week, at the institution. Although he has spent more hours at the facility than did his predecessors, not all of this time has been spent seeing patients.

At the time of trial, Dr. Saadat served as a part-time physician on the regular staff of the institution. According to the defendants, he sees patients approximately two hours per day, five days per week, principally providing gynecological services. For the nine week period from November 3, 1975 to January 3, 1976, Dr. Saadat saw an average of twenty-seven patients a week for episodes of illness.[3] Dr. Saadat also alternates on call weekends with Dr. Williams.

The regular medical staff, as of the time of trial, was supplemented by four physicians who serve on a consultant basis. Dr. David, a urologist, practices general medicine at the Facility two days a week, usually Monday and Thursday, from 9:00 A.M. to noon. Dr. Ogwo, also a urologist, practices general medicine at the Facility Tuesday and Wednesday, from 10:00 A.M. to 1:00 P.M. Dr. Poon does general medicine on Friday from 9:00 A.M. to noon. Dr. Enders has general medicine hours on Saturday from 10:00 A.M. to 1:00 P.M. Thus, among these four doctors, regular primary physician care is provided six days a week, three hours a day.

In addition to these primary care physicians, Bedford Hills is serviced by a number of specialists. A dermatologist holds a 3-hour clinic one day every other week, and a neurologist, a podiatrist and an optometrist hold clinics in the specialties. Although there was testimony that an optometry clinic was held one day a week and that the other clinics were held approximately once a month, the records for the nine-week period from November 3, 1975 to January 3, 1976 reflect that only the optometry clinic was held and that only once.

In addition to the medical services provided at the institution, Bedford Hills uses the services of outside consultants and local hospitals when needed. Northern Westchester Hospital, and Westchester County Medical Center ("Grasslands") are utilized principally for emergencies, diagnostic testing and surgery. Plastic surgery is performed at Fishkill Correctional Facility.

Plaintiffs' experts agreed that the present level of physician staffing is adequate for an institution the size of Bedford Hills. However, they contend that the quality and availability of medical care cannot be measured solely by the number of doctors. Rather, they claim, and the Court agrees, that it is necessary to inquire whether the available physicians are used to maximum advantage so that medical services timely reach all those in need. In other words, it is necessary to examine how various components of the medical care delivery system interact with each other and with correctional regulations so as to either afford or deny the physician services that are potentially available.

To prove their allegations, plaintiffs introduced the medical records of sixty-four Bedford Hills inmates who had signed medical releases. Defendants argued at trial that these records are not representative. The Court rejects this argument. Although not a random sample in a statistical sense, the records were not pre-selected by plaintiffs' attorneys. Rather, what was introduced was limited by this Court's discovery order issued in response to the defendants' resistance to broader discovery. If the records introduced by plaintiffs were atypical, defendants were free to introduce other records, provided appropriate measures were taken to protect inmate privacy. This they failed to do, and so the Court deems the records produced by plaintiffs to be representative of the medical treatment provided to the plaintiff class.

The Court cannot, without unduly extending an already lengthy opinion, make

---

3. This does not include patients seen for admission examinations, parole or work release examinations, routine gynecological examinations, or those seen in sick wing or in hospitals.

specific findings with respect to every instance of allegedly inadequate treatment cited by plaintiffs. Accordingly, the absence of a discussion and specific finding with respect to certain instances should not be taken as an oversight. Rather, the Court has examined every incident noted by plaintiffs and has concluded that cumulatively these additional incidents neither add to nor detract from the case otherwise presented.

The Court now turns to a review of the evidence with respect to the actual care rendered the inmates of Bedford Hills by the medical system.

## FINDINGS OF FACT AND APPLICATION OF LAW

### I. *Admission Health Screening*

On the day of arrival at Bedford Hills, each new inmate is referred to the medical staff for admission health screening. This process has many functions. First, it serves to prevent the introduction of infectious diseases into the institution. Second, it is used in determining the appropriate institutional classification for the inmate. Third, it is necessary to identify or confirm acute or chronic conditions, such as diabetes or hypertension, which require treatment. Finally, it can be an important tool in practicing preventive medicine.

At admission health processing, the inmate is seen by a nurse who takes a medical history, performs vaginal and rectal examinations for contraband, and takes and records the inmates vital signs. The nurse also performs a test for gonorrhea and obtains urine for a urinalysis. Additional lab work is scheduled.

Defendants' regulations provide that each new inmate should receive, as part of the admission health screening, a gynecological and general physical examination the day following her arrival or as soon thereafter as possible. Despite this regulation, the evidence adduced establishes that in the two-year period from October 1973 through September 1975, general admission physical examinations, on average, were not performed until approximately forty-three days after admission, and gynecological examinations, on average, were not performed until approximately twenty-seven days after admission. Within the two-year period, the interval between admission and examination varied widely, from four days for the performance of a general physical in March and June 1975, to one hundred and twenty-nine days in March 1974. The interval between admission and performance of an admission gynecological examination varied from a high of sixty-two days in February 1974, to two days in September 1974.

Defendants do not challenge the veracity of these statistics derived from an analysis of defendants' own records. Rather, they argue that women leave the institution for court appearances and the like and that plaintiffs' statistics fail to account for such obstacles. Defendants' argument must be rejected because they failed to offer any evidence tending to support this contention in general or in regard to the nineteen specific cases cited by plaintiffs.

Plaintiffs' experts condemned the delays in providing admission health examinations, all agreeing that the examinations should be performed within one week of admission. One reason was that the purposes of the examination are not achieved when the examination is delayed. For example, one of defendants' purposes in performing admission physicals is to properly classify an inmate for work assignments; yet women are released into the general population and assigned work after three weeks at the institution, a point at which, on the average, they will not have had their admission physical.[4]

Plaintiffs introduced evidence of problems that arose as a result of the failure to perform admission physicals promptly. For example, the nurse's admission note for Paulette Blackstock indicates that she had a

---

4. It appears that shortly before trial, the defendants altered their admissions procedures to indicate all reports of admission physicals should be available prior to an inmate's release from "reception."

vaginal discharge when she was admitted on July 16, 1974. Her admission history reflects her telling the nurse at that time that she had a "urinary infection" and a "tube infection" for which she had been treated at Rikers Island. She saw the gynecologist initially on August 14 after complaining of pain and vaginal infection on August 13. Defendants ask the Court to draw the inference that Ms. Blackstock had no complaints of pain on admission and that she did not complain prior to August 13. The Court cannot draw this inference because the "114 Lobby A.M. Clinic Book" for the period July 19, 1974 through December 30, 1974 contains several notations of complaints by Paulette Blackstock with reference to this condition. On July 19, 1974, the nurse's note indicates "Paulette Blackstock = 'tube infection.'" There are no clinic notations for any inmates for July 20, 22, 23. On July 24, there is another note "GYN—Paulette Blackstock—tube infection PID Rx on *Adm.* [Pelvic Inflammatory Disease treatment on admission]." On July 25, the nurse noted "Paulette Blackstock—wants Dr. Saadat. Infection in tubes." Thus, the conclusion is inescapable that from the time she was admitted to Bedford Hills Ms. Blackstock repeatedly complained of gynecological distress, but did not see the gynecologist until August 14 when, according to the lobby·clinic note of that day, she asked to be admitted to Sick Wing.

Another example offered by plaintiffs is Mary Kerr, a diabetic admitted on July 16, 1974 complaining of headaches. She told the nurse her eyes were "bad" and that she needed glasses. She was referred to an ophthalmologist on August 27, 1974 after seeing a doctor on August 9 for poor vision and swelling of her left eyelid. On August 27, the ophthalmologist made the diagnosis of "advanced diabetic retinopathy with retinal and iris neovascularization." In December 1974, her condition was determined to be untreatable and permanent blindness ensued. Plaintiffs argue that had she been given a prompt admission physical, the con-

dition might have been discovered earlier and might have been treatable. Although the condition might have been uncovered earlier, the subsequent history of Ms. Kerr's treatment precludes this Court from concluding that referral to an ophthalmologist six weeks earlier would have resulted in the condition being treatable.[5]

The Court has considered the other examples cited by plaintiffs and in light of the evidence as a whole is unable to conclude that the disposition of the medical complaints cited resulted from the failure to perform a prompt admission physical, rather than from the more general problem of physician access discussed *infra.* Accordingly, the Court finds that plaintiffs have failed to prove that any medically significant consequences resulted solely from the failure to provide such an in-take examination. Although an admission health examination performed soon after admission is generally considered proper procedure, *see* ABA Commission on Correctional Facilities and Legal Services, *Medical and Health Care in Jails, Prisons and Other Correctional Facilities* 7, 16, 19 (3d ed. 1974), and no reason is given why such examinations cannot be performed within one week of an inmate's admission to Bedford Hills, the Court cannot hold, absent proof that infection was thereby introduced into the prison's population or that inmates consequently received medically harmful job assignments, that delayed performance of such a general examination violates the plaintiffs' constitutional rights. *See Collins v. Schoonfield*, 344 F.Supp. 257, 277 (D.Md. 1972).

Plaintiffs contend that chest x-rays, which are taken by an x-ray technician who visits the institution one day per week, are not reported promptly by the outside radiologist to whom they are sent for reading. However, the Court has concluded that insufficient evidence was adduced to establish that delays of over one month are other than isolated.

5. The subsequent history of this case is discussed in relation to referrals to outside consultants, section IV(E)(1) *infra.*

Plaintiffs finally contend that use of the x-ray machine and defendants' practice of obtaining urine by catheterization expose the inmate class to danger. The chest x-ray machine is antiquated and, as early as the fall of 1973, defendants were advised to replace it. In April 1974, an inspector from the New York State Department of Health found the machine not in compliance with minimum state standards. Defendants have obtained a new x-ray machine but as of the date of trial it was inoperable for lack of a table.

The Court finds that the x-ray machine is inadequate and potentially dangerous. Therefore, exposing inmates to this danger constitutes recklessness. *See Newman v. Alabama, supra* at 1323–24, 1331. Moreover, defendants' continued use of this machine for at least two years after they learned of its danger and inadequacy amounts to deliberate indifference.

Expert witnesses for plaintiffs testified that catheterization of the urinary tract is a potential source of infection and not recommended procedure for obtaining urine specimens. It appears that defendants terminated this practice shortly before trial. Accordingly, the Court makes no finding relative to this discontinued procedure.

## II. *Sick Wing*

Sick wing contains approximately 19 rooms and is used to house those patients who have elevated temperatures, defined as 100° or higher, have elevated blood pressure, defined as diastolic 100 or more, have had epileptic seizures within the previous twenty-four hours, have been returned from hospitalization, and any other patient who in the judgment of the medical staff is incapacitated in some way and requires bed rest and closer observation. Of the 19 rooms, the four at the far end of the first floor corridor contain their own toilet facilities. These rooms, known within the institution as observation rooms, are used principally by the mental hygiene department. They are also used to house patients transferred to the sick wing from segregation, or suspected of having an infectious disease, or

requiring easy access to a toilet. These rooms are locked except when used to house a patient who requires easily accessible toilet facilities. Sick wing rooms not containing toilets are kept unlocked.

The nurses make rounds of sick wing at least twice a day, in the morning and evening. In addition, Ms. Daly, the Nurse Administrator, testified that she instructed her nurses to conduct a mid-day round, and that when necessary a nurse dispenses medication in sick wing in the late afternoon.

Prior to Dr. Williams' arrival at Bedford Hills in September 1974, there were no regular physician rounds of sick wing and no patient in sick wing saw a physician unless a nurse placed her name on the physician's appointment list. Dr. Williams indicated that he would like to conduct regular rounds of sick wing each weekday afternoon, but he has not always been able to do so.

In addition to the medical staff's rounds of sick wing, the corrections officers are instructed to make rounds of the sick wing every half hour. When sick wing houses a patient who is in need of closer observation, rounds are to be made every fifteen minutes.

Despite the rounds conducted by the medical staff and corrections officers, plaintiffs contend that there is a serious inability to observe sick wing patients, compounded by the patients' inability to communicate their need for medical assistance. This is because there is no nurse's or corrections officer's station within the sick wing corridor itself; the nearest nurse is located on the first floor in the main ambulatory care clinic. Although a corrections officer is stationed on each floor of the sick wing, he or she is across a lobby from the patient corridors. At the entrance to the corridors are two doors—one heavy mesh and the other heavy wood with only a small opening—one of which is always locked. Although the testimony is unclear, it appears that at least on some occasions the sick wing corridors are closed off by the heavy wooden door. The guards cannot see into the rooms without walking up and down the corridors, and

there are no call buttons or other communication mechanisms in the patients' rooms. Thus, the only means of attracting the attention of the officers is to shout or bang on the door.

As an example of the consequences of these observation and communication problems, plaintiffs cite Rosezanna Vega who was locked in a sick wing observation room upon returning from Northern Westchester Hospital emergency room where she had received forty-four stitches in her face, eye, and left arm, for lacerations inflicted in a fight. The nurse's note indicates that she was "very sleepy." A nurse's note written an hour and fifteen minutes after Ms. Vega was placed in the locked observation room states: "Officer advised me that girl fell in her room. Found laying on floor next to toilet. Girl said she fell off toilet and hurt her head." Despite this incident, Ms. Vega was placed back in her bed unattended, the nurse checking on her only periodically.

Relative to the inadequacy of sick wing, some of the plaintiffs' experts testified to witnessing the following incident during their tour of the facilities: A woman suffering from either hysteria or a seizure was admitted by a nurse and placed on the second floor of sick wing. The nurse then left the girl, observed only by other patients, even though she was still in apparent distress. Similarly, the testimony of inmate witnesses recounts instances where it was necessary for sick wing patients to attract the attention of the corrections officers to some acute situation.

■ The Court finds that plaintiffs have proven by the overwhelming weight of the evidence that there is a serious lack of communication and medical observation in sick wing. Principally because of this seriously inadequate observation and communication, all of plaintiffs' experts concluded that sick wing is inadequate. As one such witness put it:

> If you place a person in observation, the person should be observed, not only just on a round basis but presumably more or less continuously.

If you have individuals with medical complaints in an environment which is secure or locked without a means by which they can communicate to a medical provider, where their closest medical provider, in the form of a nurse, is on another floor or in a different section, you are not providing the kind of medical coverage or the medical supervision or the medical overview that is essential and presumably required when you place that person in the room in the beginning.

Defendants counter that sick wing is meant to house only ambulatory patients. The evidence reveals, however, that sick wing in fact houses patients who are incapacitated and most in need of observation and access to medical care. As a result, and as the evidence clearly establishes, patient complications may, and sometimes do, go unnoticed for a period of time, causing patients in distress to suffer needlessly.

As early as October 1973, the Joint Commission on Accreditation of Hospitals recommended that Bedford Hills install nurse call mechanisms for patient rooms and toilet areas. Furthermore, memoranda between defendants and the Superintendent of Bedford Hills introduced in evidence reveal that they too believed that patient inability to communicate a need for medical assistance rendered sick wing inadequate for observation purposes. Nonetheless, as of trial, the only response to this deficiency has been a plan to train some inmates as nurse's aides to provide supervision and assistance for those deemed to require it. Thus, defendants have made no real effort to remedy what they know to be, and the Court has found to be, a serious deficiency in sick wing.

In sum, it is clear from the evidence that inmates placed in sick wing suffer, unable to obtain assistance; defendants know this; and they have reason to know that the most dire consequences could follow. For example, defendants must know that if they place in sick wing for observation purposes an epileptic who has just had a seizure, there is a grave risk that while in sick wing

the patient will suffer a subsequent seizure that will go unobserved.

The only defense they offered is that, as yet, no patient's condition has been made worse because she was placed in sick wing. Dr. Williams so testified and on that basis opined that sick wing was not inadequate. The Court disagrees. It is of the view that it need not wait until an epileptic chokes to death on her tongue in the course of, a seizure before it may act. Accordingly, the Court holds that the inadequacies in observation and communication subject seriously ill inmates to. grave risk of harm, which renders sick wing constitutionally impermissible. Further, the Court holds that defendants' continued use of sick wing for observation of seriously ill inmates, when they knew that there was a serious lack of communication and observation, and knew or should have known that in so doing they were inevitably subjecting inmates to grave and unnecessary risks, constitutes deliberate indifference.

### III. *The Lobby Clinic—Physician Access*

█ The only medical facility at Bedford Hills other than the Hospital Building is the *lobby clinic, a small room on the first floor* of Residence Building 113.[6] It is staffed by one nurse, twice daily, between approximately 7:00 and 8:00 A.M. and 7:00 and 8:00 P.M.

The lobby clinic is the "doorway" to the medical system and the principal means of delivering medical care at Bedford Hills. Inmates who seek medical treatment or prescribed medication or have questions about any aspect of their medical care must report to the lobby clinic during its two hours of operation.[7]

The lobby clinic serves two broad functions: the administration of prescribed medication and sick call. The latter is a triage, or nurse screening, procedure whereby, theoretically, nurses first determine who requires treatment by a physician and then set priorities among those who require a physician visit. Dr. Williams testified that there are limited physician services relative to the demand so that he relies on the nurse screening procedure to see to it that those most in need of physician services get them.

Plaintiffs claim that the lobby clinic procedure is responsible for the principal deficiency in the Bedford Hills medical system, namely, substantially delayed or denied access to a physician for diagnosis and treatment of significant illnesses. As will be discussed hereinafter, the Court finds that plaintiffs clearly prove this claim by means of two avenues of proof: first, by introducing certain inmate medical records, plaintiffs prove sufficient instances of denied or substantially delayed access; second, by showing that certain defects in the lobby clinic operations, facilities and record keeping result in a failure to screen, plaintiffs prove that denial of access is inevitable. These two avenues of proof, each of which is independently sufficient to sustain plaintiffs' claim, will be considered *seriatim*.

#### A. *Evidence That Some Inmates in Fact Were Denied Access to a Physician for Substantial Periods of Time*

Plaintiffs introduced the medical records of thirty-five inmates who, they claim, were denied access to a physician for substantial periods of time.

One case cited by plaintiffs is that of Mary Ledgister. On January 28, 1975, the

---

**6.** At one time lobby clinics were operated in each of the three residential buildings. This required two nurses to conduct the clinics. Some months prior to the trial, a single lobby clinic was established to serve all of the residential buildings.

**7.** An inmate whose prescribed medication must be administered at hours other than those of

the lobby clinic reports to the main clinic. An inmate requiring medical attention when the lobby clinic is not operating may report her request to a corrections officer who will call the main clinic. She may then be directed there. In that event, she will be seen by a nurse.

nurse's note indicates that Ms. Ledgister complained of sharp stomach pains and pain on urination. She was not seen by a physician until April 2, 1975. Plaintiffs contend that she complained at the lobby clinic numerous times during this interval. The Court has examined the lobby clinic notebooks [8] for this period, but has found no complaint at all beyond that of January 28. Dr. Williams testified that Ms. Ledgister had an I.U.D. and that abdominal pain frequently accompanies such a device. Although plaintiffs argue that there is no evidence that the nurses knew she had an I.U.D., her admission history reflects that she had one inserted in January 1973. In light of all these facts, the failure to respond to Ms. Ledgister's complaint was reasonable.

Another example cited by plaintiffs is that of Paula Herbert. She complained on January 18, 26, 28, 29, 30, 31 and February 2, 3, 4, 5, 6, 7, 8 of a nodule growing on her nose, a skin rash, and shortness of breath and requested to see a physician. She was not seen by a doctor until February 14, despite the fact that on many occasions the lobby clinic nurse had put a number of stars next to her name in the lobby clinic book.

Another example cited by plaintiffs is that of Yvonne Lee who was admitted to Bedford Hills on April 23, 1975. At that time, Ms. Lee informed the nurse of her history of urethral surgery and the nurse noted that she was difficult to catheterize. Ms. Lee testified that two days thereafter she began asking to see a doctor. Her chart indicates complaints of urinary distress—flank pain and sensation of need to void, or "kidney pain,"—on May 2, 3, 4, 6, 7, and 11, 1975. In each instance, she was given "nebs" for pain and told she was on the doctor's list. The first time she saw a physician was on May 13, 1975 when she was examined by the gynecologist. On May 20, 1975, she was given a physical examination as part of the admission health screening. Ultimately, Ms. Lee was diagnosed as having a fistula for which she underwent surgery.

Theresa Durante was admitted to Bedford Hills on July 31, 1974. On admission she informed the nurse that she suffered from long, irregular periods and that she sometimes passed large clots. Ms. Durante testified that she complained three or four times a week thereafter at the lobby clinic about her menstrual problems. The lobby clinic notebooks show that she complained on August 13, 1974 of a long period with a heavy flow. On August 21 and 28 and September 12, there are noted additional requests for an appointment with the gynecologist. When Ms. Durante was seen by a physician on August 23 and September 29 for an unrelated knee injury, she repeated her complaints concerning her menstrual period. Each time the physician noted a referral to Dr. Saadat for her gynecological complaints. She was not seen by the gynecologist until October 18, 1974, when he diagnosed the condition as menorrhagia (excessive menstruation) and prescribed birth control pills to control her menstruation.

Louise Johnson, an inmate who had previously suffered from toxoplasmosis (parasitic infection) of the eye, complained of eye problems at the lobby clinic on January 27, 29, 30 and February 2, 3. On February 4, her previously scheduled appointment with an outside ophthalmologist was moved up to February 10 from February 13. She was not seen by any physician in the interim, even though the lobby clinic nurse had noted "Emerg." next to her complaint in the lobby clinic book on January 27, 1974.

The inmate charts introduced at trial are replete with letters from inmates requesting to see a physician and contending that they had made numerous requests at the lobby clinic. In addition, in the above described cases of Paula Herbert, Yvonne Lee, Theresa Durante and Louise Johnson, the record supports plaintiffs' contention that

---

8. The contents, use and usefulness of these notebooks is discussed in section III(B)(3) *infra*.

there are significant delays—anywhere from two weeks to two months—in obtaining access to a physician through defendants' lobby clinic procedure.[9] On the other hand, in a number of instances, plaintiffs' contention is not substantiated by the record. An example is that of Mary Ledgister where the record reflects an isolated complaint of a common problem. In such cases of very minor common ailments, the Court is willing to defer to defendants' treatment and deem insubstantial any delays relating thereto. Nonetheless, the Court finds that plaintiffs proved sufficient instances of substantial delays in obtaining access to a physician for needed medical attention to refute the contention that such delays occur only in isolated cases.

Furthermore, it is reasonable to conclude that plaintiffs may have been unable to prove additional instances of delay solely because defendants' medical records are so haphazard and incomplete. For example, in order to determine if and when an inmate complained at the lobby clinic, it is necessary to examine the individual lobby clinic notebooks[10] because very few lobby clinic notes are transferred into the patients' charts. This requires an examination of at least three different notebooks for any given inmate on any given day. Even then, one cannot be certain that an inmate did not make a complaint because if the inmate were in segregation or in the hospital or, for part of the period covered by this lawsuit, in another residence area, other notebooks would have to be consulted. Furthermore, all of the above examinations may be futile for, as the Court finds *infra*, not all inmate complaints are noted in the lobby clinic notebooks. Thus, while plaintiffs have proven sufficient instances of denied access to sustain their claim, the Court suspects that other unproven instances have occurred as well.

**B. Evidence that the Lobby Clinic Operations, Facilities, and Records Cause a Failure in Screening (Which Must Result in Substantially Delayed or Denied Access)**

**1. Defects in Screening Caused by the Lobby Clinic Operating Procedure**

The lobby clinic procedure is initiated by a corrections officer from Building 113 calling for the lobby clinic, one residence corridor at a time. The inmates from that corridor then line up in front of the lobby clinic on a "first come, first served" basis. There is no differentiation between those who have come for prescribed medication and those who have medical complaints. The first operational defect, then, is the combining of the medication and screening functions simultaneously in one clinic without providing for any system of initial priorities.

Secondly, this combining of functions also means that one nurse has to attend to an overwhelming number of patients in too short a period of time. Many of these patients come to the lobby clinic only to receive prescribed medication. Prior to September 1975, the lobby clinic nurse dispensed as many as 200 prescribed medications. Since September 1975, many inmate medications have been distributed in bulk, so the number of inmates receiving their medication through the lobby clinic has been reduced to approximately 50 a day. Nevertheless, this figure, plus the 15 to 30 inmates with medical complaints, adds up to approximately 65 to 80 patients to be seen within the brief period the clinic is open. Thus, it was estimated that the entire exchange between the nurse and an inmate seeking medical assistance is concluded in 15 to 20 seconds.

A third operational impediment to screening is the disorder of the line. The inmates

---

9. See also the medical record of Paulette Blackstock discussed in relation to Admission Health Screening, section I *supra*.

10. The discussion that is to follow should be considered in relation to the fuller discussion of lobby clinic notebooks in section III(B)(3) *infra*.

maneuver for priority on the line and interrupt each other. Thus, the nurse/patient encounter occurs under not only hurried, but also disorderly, circumstances. Therefore, the encounters are brief and frequently chaotic—hardly conducive to performing meaningful medical evaluations.[11]

2. *Defects in Screening Caused by the Physical Limitations of the Lobby Clinic*

All of the plaintiffs' expert witnesses agreed that a minimally adequate system of nurse screening requires physical contact between a qualified medical provider and patient, in private, with minimal diagnostic measurements such as a blood pressure reading, and a physical examination of the locus of the complaint. They found the lobby clinic inadequate for the performance of these tasks.

Likewise, Dr. Williams himself, in November 1975, promulgated a directive, entitled "Procedures For Screening," which lists the requirements for nurse screening as follows:

"1. History of current complaint

2. TPR [Temperature, Pulse, Respiration]

3. Blood Pressure

4. Simple Exam. Re: complaint, Rx and Disposition"

Thus, plaintiffs and defendants are more or less in agreement as to the minimal diagnostic procedures required for adequate screening. The physical structure of the lobby clinic, however, is not conducive to performing even these minimal screening procedures.

The lobby clinic is a small room containing two storage cabinets, a table and a chair. The door to it remains locked and contains a barred, cashier's type window. The sole nurse is stationed inside the room behind the locked door, and a corrections officer is stationed just outside. Each inmate approaches the window in turn and gives her name and the purpose of her visit. There is no opportunity for private consultation with the nurse. If the inmate is there to receive medication, the nurse hands it to her through the window. If she has a medical problem for which she seeks treatment, the nurse asks some basic questions to determine the nature of the complaint, its severity and duration. No physical examination can be conducted because inmates are not permitted inside the lobby clinic while the medications are out. The most the nurse can do at this time, aside from making routine inquiries, is take the inmate's temperature and pulse.

11. A rather vivid description of the lobby clinic procedure is recorded by the nurse operating the evening clinic on August 1, 1974:

Evening count was cleared [at] 9:13 PM . . . [and] then Clinics had to be called 10 at a time. Stagger system so there'd be a gap to wait—then late comers would come in *any* old time [and] it was like a circus the system is no good, because now 3 or 4 corridors were overlapping each other. . . . I had to refer from [one] corridor to another as girls came [from] either 113ab also 112ba 113cd 112CD *all* at the same time. . . . 2 wks ago had to call a girls name to find out where she was [and] 2 wks ago it took till after 11 PM to do 114ab. Tonite it would have been longer for 114cd had a real long list. I called Miss Clement—she allowed 2 only at a time just this once to come down for med[ication]. Is it *still* my fault because I can't rush something like med[ication] lotions [and] creams to be done in short space

of time. Mrs. Warne or Miss Clement should witness the clowning that goes on for serious assignment as ours from beginning to end—1 eve clinic [and] see how the time goes. Maybe a better sol[ution] will be devised. . . . Why in blazes do you not give them the damned stuff to hold [and] use [and] not take up important nursing time. I can't see polluting a body this way then trying to ease the burden it took. . . . Daly—please ask them to do the former system.

Exhibit 74f, Daily Report Book, July 25, 1974 to September 8, 1974, August 1 entry. (Emphasis in original).

In addition, the following notation appeared in the margin of the above quoted lobby clinic note:

Started Clinic 9:13 tell me how to give all in just about 3/4 hr.

On the basis of these limited findings, and without the benefit of the patient's chart, physical examination, a blood pressure reading, or even a private consultation with the inmate, the nurse must determine whether to administer medication from the standing orders (for example, non-prescription medications such as antihistamines, aspirin, or antacids for complaints of colds, headaches, menstrual cramps, toothaches and stomachaches), or refer the inmate to a physician.[12]

It is clear to the Court that as a result of the operational defects and physical limitations of the lobby clinic, the nurse *cannot* conduct any meaningful evaluation of an inmate's medical complaint. As a result, there must be a failure to screen, which, in turn, must result in a denial of access.

Further, even if the lobby clinic nurse were able to conduct an adequate medical evaluation, it would be for nought, for a failure to screen also results from defendants' reliance on the inadequate lobby clinic records for determining inmate access to a physician. The Court now turns to a discussion of this additional defect in screening.

### 3. *Fatal Defect in Screening: Nurse Record Keeping*

When she examines a patient, the lobby clinic nurse records certain observations in what are known as lobby clinic notebooks. Based on these notebooks and her brief encounter with each inmate, the nurse draws up a physician appointment list. This list contains the name of every inmate who asked to see a doctor, without any differentiation of those whom the nurse believes should see a doctor and without enumerating the order in which they should be seen. Such a list is drawn up by each of the five or six nurses who staff the two daily sessions of the lobby clinic during the course of a week. Then each examining nurse, rather than scheduling the physician

appointments herself, turns over the above described list to another nurse, Ms. Geyser, who determines the priorities for the available physician time and schedules appointments with the physicians. These undifferentiated lists obviously are of no guidance to Ms. Geyser, who conducts the morning clinic herself only once or twice a week; and the evening clinic nurses are not available when she draws up the physician appointment schedules. Consequently, for guidance in setting priorities she must rely on patient records—perhaps the patients' charts, but most likely the lobby clinic notebooks.

The lobby clinic notebooks are the only records kept of the interactions at the lobby clinic. Between the five or six different nurses who may staff the morning and evening lobby clinics, there is one lobby clinic notebook for the morning clinic, but separate notebooks for each of the nurses who take turns working the evening clinic.

The function of the lobby clinic notebook is to maintain a record of the names of patients seen and the nature of their complaints. In practice, however, some typical entries include solely the patient's name and a one word description of the complaint, such as "throat" or "stomach" or "headache." Others include only the treatment or advice given. Still others will list only the inmate's name followed by a doctor's name. Furthermore, given all of the operational difficulties discussed earlier, particularly the length and disorder of the lobby clinic line and the extremely limited time the nurse has to get through it, the Court is convinced that not all inmate medical requests are even noted in the lobby clinic notebooks.

Ms. Daly characterized the lobby clinic notebooks as mere "reminders." The Court cannot accept this characterization, however, for it is abundantly clear that Ms. Geyser relies upon these notebooks to a

---

12. There was some testimony that should the nurse feel that a further examination or blood pressure reading, etc. is required, she will instruct the inmate to return to her corridor and wait until all medication is dispensed. The nurse can then recall her and examine her within the lobby clinic room. In practice, however, this procedure appears to be rarely used.

great extent, if not exclusively, in drawing up the physician appointment lists.

However, the Court finds that the lobby clinic notebooks are grossly inadequate for this task. Therefore, reliance upon them when they are inadequate for this purpose results in a failure to screen, and in turn, in denied or substantially delayed access.

In sum, then, the evidence of numerous defects in the lobby clinic proves that the inevitable result of the lobby clinic is a failure to screen, which in turn inevitably results in unnecessary suffering because of denied or substantially delayed access to a physician for diagnosis and treatment of physically distressing illnesses. Defendants have not refuted this evidence. On the contrary, plaintiffs have reinforced this evidence by proof of a sufficient number of concrete instances of such denied or delayed access. Furthermore, in light of the Court's finding that the lobby clinic precludes screening, it is likely that there are other instances of denied access, proof of which was prevented by the gross inadequacy of defendants' medical records system.

Courts have held that a sick call procedure for prompt referrals of those in need to a physician is constitutionally required. *See, e.g., Newman v. Alabama, supra* at 1331; *Jones v. Wittenberg,* 330 F.Supp. 707, 718 (N.D.Ohio 1971), *aff'd sub nom., Jones v. Metzger,* 456 F.2d 854 (6th Cir. 1972). Similarly, as previously noted, numerous courts have held that substantially delayed access to a physician for incidents of illness violates the Constitution. For example, in *Miller v. Carson, supra,* the court found shocking a two week delay in access to a physician for diagnosis and treatment of an earache. Likewise, this Court is constrained to find a four week delay in treating Ms. Blackstock's known gynecological disease,[13] to state one example, equally shocking. If the failure to insure reasonably prompt referral to a physician for necessary medical care is unconstitutional, "the deficiency which spawns the infirmity," the lobby clinic, is also unconstitutional. *Newman v. Alabama, supra* at 1331.

Accordingly, the Court holds that the lobby clinic, as a means of access to a physician, deprives plaintiffs of necessary medical care and therefore constitutes cruel and unusual punishment in violation of the eighth and fourteenth amendments to the Constitution.

Furthermore, the Court not only finds that the lobby clinic fails as a screening mechanism, but also finds that it should have been readily apparent to anyone with knowledge of the clinic's procedures and facilities that the clinic could not possibly succeed at its intended function.

As health care providers, defendants are responsible for the physician referral operation. However, none of the defendants except Ms. Daly had witnessed the lobby clinic in operation, and she had not observed it in the last year. Dr. Williams had never seen the lobby clinic room and neither he nor Dr. Frost had ever seen the lobby clinic notebooks. Thus, it is apparent that the defendants failed to inform themselves of the clinic's procedures, facilities and operations, choosing instead to rely completely on the lobby clinic nurses. Had they informed themselves of the lobby clinic's facilities and procedures, they would have known that the nurse screening upon which they relied could not be properly performed in the lobby clinic and that seriously inadequate screening would inevitably result.

Therefore, the Court holds that the defendants' failure to observe the lobby clinic procedure and insure its adequacy as a sick call/physician referral procedure amounted to reckless failure to inform themselves whether plaintiffs' medical needs could be met in this fashion. The Court further holds that this constituted deliberate indifference to whether or not plaintiffs' medical needs were in fact being met.

## IV. *Follow-Up Care*

In addition to providing for initial access to a physician, a health care delivery system should provide for follow-up care whereby

---

**13.** See note 9 *supra.*

the doctor's orders for diagnostic tests and further treatment will be followed. Plaintiffs contend, however, that the medical system at Bedford Hills fails in several respects to provide adequate follow-up care. First, they contend that ordered laboratory tests sometimes are not performed, certain test results are routinely delayed, and others are not reviewed and followed-up. Second, they contend that follow-up appointments with Bedford Hills physicians are not scheduled. Third, they contend that the chronically ill are not adequately monitored and observed. Fourth, they claim that medically harmful work assignments are not changed. Finally, they contend that they are denied referrals to outside specialists for diagnosis and treatment and elective surgery.

### A. Laboratory Services

### 1. Failure to Perform Tests

Laboratory testing is an important diagnostic tool. At Bedford Hills, there is a laboratory technician responsible for taking blood and urine specimens, ear, nose and throat cultures and various other specimens for analysis. She performs some routine testing in the prison laboratory. Other tests are performed at an outside commercial laboratory. Pap tests and venereal disease tests are sent to a state laboratory in Albany.

When a doctor orders a laboratory test, a notation is generally made in the laboratory book. The laboratory technician testified that she will perform the test on the date ordered by a physician when he so specifies; otherwise, she fits it into her regular schedule. The laboratory technician testified that generally she will telephone the corrections officers on the corridors or will send them a typed list requesting them to send down the women for whom laboratory tests are scheduled.

As evidence of nonperformance of ordered laboratory work, plaintiffs point to several of the sixty-four inmate medical records available to them. For example, Paulette Blackstock was treated for a bladder infection on May 21, 1975. Dr. Williams ordered that a follow-up urine culture and sensitivity test be performed twenty-four days later, on June 14, 1975. Ms. Blackstock's record contains no indication that this follow-up test was performed. Similarly, Rebecca Booker's follow-up urine culture and sensitivity test, which Dr. Williams ordered on March 26, 1975 to be performed thirty days later, was never performed.

A blood count was ordered for Paulette Blackstock by the gynecologist who was treating her for vaginitis. The laboratory technician noted in her chart that the order was not entered in the laboratory book, so she (the laboratory technician) did not discover it until September 6, 1975. She performed the test on September 27, 1975.

On June 21, 1975, Frances Chacon, who had a history of rheumatic fever and high blood pressure, saw a physician for headaches and neck and shoulder pain. In addition to medication, he ordered a blood count. As of September 24, 1975, there was no record that the test had been performed, despite Ms. Chacon's continual symptomatic complaints.

Immediate thyroid tests were ordered for Patricia Narganes on December 24, 1974. These tests were not performed until August 12, 1975, after another doctor reordered them.

Defendants countered that the women do not come to the laboratory when called and thus the failure to perform diagnostic tests is due to a lack of cooperation from the plaintiff class. For example, defendants point out that Frances Chacon repeatedly failed to come for laboratory work in the fall of 1974. However, defendants introduced no evidence to establish that in the particular instances cited by plaintiffs the women failed to appear for scheduled laboratory work. Moreover, the laboratory technician testified that the women sometimes stated that they had not been notified of the tests by the corrections officers. Thus, the Court cannot conclude that these specific failures to perform ordered diagnostic work resulted from any lack of cooperation on the part of the women.

On the other hand, the Court cannot conclude from the instances cited by plaintiffs that the failure to perform diagnostic tests is widespread and chronic. Rather, it is apparent from an examination of the medical records as a whole and the testimony of the laboratory technician, who favorably impressed the Court, that the vast majority of laboratory work is performed relatively promptly. Nevertheless, the Court finds that although the failure to perform laboratory work is confined to relatively few instances, such failures occur repeatedly. These failures are caused by and are the necessary result of a variety of factors including poor record keeping whereby the laboratory technician is never informed of the orders, and lack of notice to the patients of the scheduled work.[14]

### 2. Delayed Test Results

A problem of a different order is presented by pap tests and venereal disease tests which are sent to the state laboratory in Albany; the lab reports are not returned for a substantial period of time.

For example, a syphillis test for Helen LaVore was taken on December 13, 1973, but the result was not reported until February 5, 1974. Another sample was taken on March 28, 1974, but not reported until May 1, 1974. Ms. Daly and Dr. Frost both noted problems with regard to the Albany lab's processing of syphillis tests.

Dr. Saadat, the gynecologist, testified that pap smear results generally are not reported for four or five weeks, although in his private practice he receives pap smear reports within one week. In some instances, the pap reports indicated that they could not be read for cancer due to, for example, severe inflammation and blood. However, plaintiffs have shown that repeat tests sometimes were not performed for inordinate periods of time.

The Court concludes that the delay in reporting venereal disease tests and pap tests, standing alone, does not rise to the level of a constitutional violation which would require judicial intervention. This conclusion is based on a number of factors. First, the doctors at Bedford Hills are aware that they will not receive the results of these tests for at least one month. Thus, the delay in reporting cannot be deemed to constitute a failure to carry out a physician's orders. If in a given case a physician believes that delay will be detrimental to his ability to treat a patient, he can arrange for different laboratory services. When viewed from this perspective, plaintiffs' claim is, in reality, against the doctors, as opposed to those responsible for carrying out the doctors' orders, for knowingly ordering tests from laboratories which are notoriously slow in reporting results. However, plaintiffs have failed to prove sufficient instances where the delay was detrimental to the patient or where it would have been incumbent upon the physician to send the tests to a laboratory which would have reported the results promptly. Accordingly, the Court finds that the proven delays do not amount to a constitutional violation.

### 3. Abnormal Test Results Not Followed

Plaintiffs contend further that even after laboratory reports are received, significantly abnormal results are not followed-up with necessary treatment. There was testimony that normal laboratory test results are merely filed in the patient's chart without being brought to the attention of the ordering physician. Abnormal test results are underlined in red and placed in a folder to be reviewed by the doctor ordering the test. An extremely abnormal test requiring immediate action, for example a high blood sugar test in a diabetic, is brought to the attention of any physician present or, in lieu thereof, a nurse.

As an example of the failure to follow-up laboratory reports plaintiffs cited the case of Elizabeth Powell who was seen in February, 1975 for a discharge from a lesion in her right breast. On February 17, 1975, a

14. These administrative and communication failures that interfere with the delivery of follow-up care are discussed more fully in section IV(B) infra.

cytology sample and a culture of the discharge were taken. The culture revealed an infection, but the cytology test was returned as too scant to evaluate. Plaintiffs claim that a repeat cytology sample to test for cancer was never taken. However a review of Ms. Powell's chart reveals that she suffered from an infection which was responding to the treatment given. Moreover, a mammogram performed on May 5, 1975 was normal. In light of the record as a whole, the more reasonable inference is that the treating physicians determined that Ms. Powell probably did not have cancer and a repeat cytology was not necessary.

Another example offered by plaintiffs is Angie Vasquez. A liver test (SGOT) performed on Ms. Vasquez on September 13, 1974 was markedly outside normal limits and precipitated a telephone call from the lab to Bedford Hills the next day. The nurse's note reveals that a physician was notified and he ordered that a physician's appointment be made as soon as full test results were available. No physician visit is recorded. On October 16, 1974, a nurse noted that Ms. Vasquez had bruising on her arm and complained of a "diseased liver." The ecchymosis (bruise) was again noted on November 1, 1974. She was admitted to sick wing and Dr. Williams ordered a repeat liver test on November 4, 1974, but this was not performed. This order was repeated on November 20, 1974 and by another doctor on November 27, 1974. Ms. Vasquez was not notified. Consequently, the test could not be performed until December 3, 1974. It was normal.

Although Dr. Williams testified with respect to the abnormal liver test of September 13, 1974, he did not commence serving at the institution until October, 1974. The most reasonable inference, therefore, is that the September 13th test was not followed-up until Ms. Vasquez complained about one month later of bruising of the extremities, and Dr. Williams took over her treatment.

As another example of the delayed response to abnormal test results plaintiffs cite the case of Mary Reed. On December 10, 1974, Ms. Reed complained of vomiting blood. When she was seen the following day by Dr. Williams she also described mid-stomach pains. He ordered that her stool be tested for blood. He reviewed the results, which were positive, when received on December 21, 1974, and he ordered that she be scheduled for an examination. He repeated that order on January 15, 1975. On January 24, 25 and 27 she complained of abdominal pain. On January 27 she was finally seen by Dr. Williams who formed the tentative diagnosis of an ulcer and ordered a GI series. In this instance, the abnormal lab results were reviewed but the examination ordered twice by Dr. Williams was not scheduled for over one month and then only after repeated complaints of pain.

Another inmate, Geraldine Strong, had a blood test on July 9, 1975 showing anemia. The result was neither noted nor treated until September 5, 1975.

As with the failure to perform laboratory tests ordered by a physician, whether abnormal laboratory reports are followed-up is a hit-or-miss proposition. The vast majority of laboratory reports are normal, and cultures which reveal infection are generally followed-up. However, in some instances, abnormal test results may not be followed-up for one to two months. This is of grave concern because the laboratory results which are not followed-up are those revealing possibly serious illnesses. The Court finds that, as with the non-performance of laboratory tests, these instances may be relatively few in number but they occur repeatedly as a result of administrative, communication and record keeping problems.[15]

### B. *Follow-Up Medical Appointments*

Plaintiffs contend that when a physician orders a patient returned for a follow-up visit, an appointment is not always scheduled for the date ordered or within any one of the next five working days. In support of their contention, plaintiffs introduced

15. *Id.*

statistics for the period October, 1974 to July, 1975, during which an average of 22.2 follow-up appointments were ordered each month. Of these, an average of 9.3 were not conducted on the ordered date or within five days thereafter.

In addition to these statistics, plaintiffs cite the medical records of specific Bedford Hills inmates who, they contend, did not receive follow-up appointments. For example, Carmen Garcia was referred to the gynecologist by a general practitioner on January 21, 1974. She was not seen by him until March 18, 1974 when he prescribed treatment for a vaginal infection and ordered her return in two weeks. She did not see the gynecologist again until May 8, 1974 at which time he treated another vaginal condition and ordered her return in three weeks. She was seen precisely three weeks later, but no further treatment was required. On July 25, 1974, she wrote a letter requesting a leave to visit an outside gynecologist because, she stated, she had failed to gain access to Dr. Saadat, the Bedford Hills gynecologist. On August 2, 1974, she was seen by Dr. Saadat and treated for a vaginal discharge. He ordered her return in three weeks. She was not seen by him until January 16, 1975 at which time she had no gynecological pathology.

Minnie Wrenn was seen by the gynecologist on September 12, 1974 for abdominal pain. He diagnosed her as having a small, myomatous uterus and ordered her returned in two weeks. However, she was not seen by him again until August 18, 1975, eleven months later. Her condition had persisted so he ordered her returned in four weeks. She was seen again within three weeks and was referred to an outside doctor for a consultation regarding a possible hysterectomy.

Both of the individuals in the two cases cited above suffered from demonstrable pathology causing discomfort and distress. Yet in each case, some of the doctor's orders for follow-up visits were followed to the letter, while others were ignored. This discrepancy does not result from any lack of physician concern or diligence. For example, in Ms. Wrenn's case, Dr. Saadat's notes indicate that he was concerned about her condition and wished to follow her carefully. Rather, as with the failure to perform laboratory tests and the failure to follow-up abnormal test results, there appear to be failures in administration and communication which render the delivery of prescribed follow-up care a hit-or-miss proposition. These administrative and communication failures will now be discussed.

One problem is that inmates are not given advance notice of laboratory work or physician's appointments; nor are they given the results of laboratory work. Rather, on the morning of an appointment, the medical clerk calls a lobby officer who in turn calls the appropriate corrections officers to notify the women who will be seen that day. As a result, there are many opportunities for communication failures and conflicts in scheduling. For example, gynecologist appointments may have to be cancelled because women are experiencing their menstrual period. The defendants did not testify to any attempt to consult the women concerning their availability for appointments on given days or to notify them in advance.

It also appears that correctional orders, on occasion, interfere with medical scheduling. Ms. Blackstock was scheduled to see Dr. Saadat on September 6, 1974 by his order. The nurse noted that the inmate was "seg locked on corridor" and that the appointment should be rescheduled. It was rescheduled for September 27, but Ms. Blackstock did not appear; she was in the medical building receiving new admission testing on that date. Although she presumably was called that morning by Dr. Saadat's office, it is reasonable to infer that the message did not reach her.[16] She did not

---

**16.** Since new admission testing includes a fasting battery of tests which presumably is done in the morning, it is probable that Ms. Blackstock was in the laboratory in the morning.

And since Dr. Saadat sees patients only in the morning, it is likely that Ms. Blackstock was in the laboratory when he called and therefore

see Dr. Saadat again until December 5, 1974.

Carol Lewin's eye record contains the note "9–20–74 called down to see Dr. Adams (optometrist). (Seg. Locked)." Although defendants contend that medical care is not denied to those in segregation, it appears that such care is limited to nurse visits and responses to acute situations, with other treatment deferred.[17]

### Follow-Up Laboratory Services and Follow-Up Medical Appointments—Court's Conclusions

With respect to laboratory services, plaintiffs claim denial of follow-up care in three ways: (1) failure to perform tests; (2) delay in reporting test results; and (3) failure to follow-up abnormal test results. As to the second of these, the Court has already found that plaintiffs failed to establish their claim.[18] As to the first and third, the Court so far has found that plaintiffs have proven several instances of failure. With respect to the failure to schedule follow-up medical appointments, the Court finds that plaintiffs have proven that this occurs with greater frequency. The Court now turns to an examination of the legal significance of plaintiffs' proof of failures to provide follow-up care in laboratory services and medical appointments.

As found earlier, the proven failures in follow-up laboratory services and medical appointments more often than not have a common cause: poor administration and poor communication between the medical system and the inmates. As a result of these administrative and communication problems, the Court has found that the laboratory technician is not informed of test orders, lab results are not brought to a physician's attention, inmates are not informed of laboratory tests, test results, or physician appointments, and physician appointments are either not scheduled or scheduled at times which conflict with inmate commitments. These failures in turn result in inefficient use of physician staff and failure to comply with physician orders.[19]

The failure to carry out physician-ordered treatment is not constitutionally tolerable. *See, e. g., Campbell v. Beto, supra; Martinez v. Mancusi, supra; Tolbert v. Eyman, supra; Edwards v. Duncan, supra; Derrickson v. Keve, supra.* An individual prisoner complaint which alleged that the prisoner waited one month to see a doctor, and thereupon the laboratory work the doctor ordered was either not performed or the doctor was never informed of the results, would certainly state a claim for relief. *See Bishop v. Stoneman, supra.* The question here is whether a *system* which, due to failures in administration and communication, repeatedly produces that sort of result for a relatively limited number of individuals is equally repugnant to the Constitution.

In *Newman v. Alabama, supra* at 1331, the court stated:

A fourth debility under which the APS was found to labor was the presence of disorganized lines of therapeutic responsibility. An ineluctable by-product of this condition is that treatment prescribed by doctors is not administered by medical subordinates. Since the failure of prison officials to comply with doctors' orders has occasioned judicial disapprobation, *see Martinez v. Mancusi, supra; Sawyer v. Sigler, supra,* a medical organizational

---

either did not get the message or could not have kept the appointment anyway.

17. Defendants' lobby clinic notebooks contain nurses' notes of some inmate complaints and inmates to be seen following their release from segregation.

18. See section IV(A)(2) *supra.*

19. Almost all of these deficiencies could be alleviated by one simple expedient: direct communication between the medical staff and the inmates they serve. If inmates were scheduled for laboratory tests and follow-up appointments and given an appropriate pass when they were to see the doctor, the inmates would be more likely to receive the ordered care. Other means of dealing with these problems could be devised, if this should prove impractical.

system pregnant with the possibility of noncompliance is similarly amenable to attack.

Similarly, in this case, although the proven instances of failure in follow-ups with respect to laboratory services and medical appointments may be few in number, cumulatively they create the impression of a system which fails to insure that ordered treatment is, or can be, delivered. Thus, despite the number of doctors and nurses theoretically available, the built-in administrative and communication impediments to carrying out doctors' orders insures that there inevitably will be instances of delayed diagnosis and treatment and, ultimately, needless inmate suffering. One or two oversights may be negligence. But a system which has a built-in guarantee of repeated oversights surpasses negligence and is recklessly inadequate.

Further, the consequences of failure in any given case may be grave. An individual suffering from serious disease may go undiagnosed and untreated because ordered laboratory work is not performed, an abnormal result is not timely followed-up, or an ordered reappointment is not made. This prospect, considered in conjunction with the Court's previous finding that plaintiffs suffer delay in obtaining initial access to a physician, leads to the conclusion that the procedures for initial access and follow-up care contain the potential for disaster. That plaintiffs could prove no deaths or permanent disabilities resulting from the specific instances of failure does not alter this Court's view of the case. The Court reiterates that it need not postpone acting until a catastrophe occurs.

In summary, then, the Court concludes that due to administrative and communication difficulties the system for providing follow-up laboratory services and medical appointments fails to insure that all doctors' orders are carried out, results in unnecessary prolongation of pain, and contains within it the potential for dire consequences. Moreover, since the physicians are forced to repeat orders that are not carried out, they are aware that the system

for providing ordered care repeatedly fails. Accordingly, the Court holds that the system for delivering follow-up laboratory services and medical appointments is unconstitutional and that defendants' knowing reliance upon such a clearly inadequate system constitutes deliberate indifference.

### C. Follow-Up Care for Chronic Illness

A number of the prisoners at Bedford Hills have chronic illnesses such as hypertension, asthma or lung disease. These illnesses require monitoring because they may become acute. Recognizing this, Dr. Williams considers the treatment of hypertensives, for example, to be high priority. Plaintiffs contend, however, that Bedford Hills fails to carry out a systematic course of evaluation and treatment of the chronically ill, particularly hypertensives.

In each of the hypertension cases in the medical records introduced at trial, doctor's orders for monitoring of blood pressure were not carried out. Luz Pizarro suffered from hypertension and, on February 21, 1975, Dr. Williams ordered that her blood pressure be taken twice a week for three weeks. It was taken twice during this period—once on February 25 and again on March 17 after she blacked out or had a seizure. Dr. Williams repeated the order on March 19, but no blood pressure readings were recorded during that three week period. Blood pressure readings ordered for Lucy Jackson, a fifty-eight year old woman with a history of hypertension, were likewise never taken. Other instances of failure to take ordered blood pressure readings are contained in the charts of Frances Chacon and Gladys Dieppa.

Dr. Williams admitted that blood pressures he had ordered were not taken. He attributed this to lack of staff time. It appears this also may result from the inability of the lobby clinic nurse to take blood pressure readings, a fact of which Dr. Williams was unaware.

Plaintiffs further contend that the failure to develop a treatment for hypertensives also results in lapses of prescribed medication, as in the case of Ms. Jackson.

Dr. Ogwu had ordered that Ms. Jackson be given Diuril until Dr. Williams could develop a plan for treating her high blood pressure. The Diuril was discontinued on April 24, 1975, although Dr. Williams did not take over her treatment until August 15.

■ As stated earlier, the failure to carry out physician-ordered treatment is not constitutionally tolerable. *See, e. g., Campbell v. Beto, supra; Martinez v. Mancusi, supra; Tolbert v. Eyman, supra; Edwards v. Duncan, supra; Derrickson v. Keve, supra.* Since failure to take physician-ordered blood pressure readings and to administer prescribed medication are just other instances of failure to carry-out physician orders, the Court holds that these too are not constitutionally tolerable. Furthermore, defendants' tolerance of these continued failures constitutes deliberate indifference.

Plaintiffs also contend that defendants fail to record the administration of each dose of medication to the chronically ill and this hampers proper treatment because one cannot know if continuation of symptoms results from ineffective treatment or from failure to follow the prescribed treatment. The Court cannot agree with this contention because in its review of the medical records, it has found numerous instances where the failure to take prescribed medication was recorded. Moreover, it would seem that one could determine just as effectively whether or not prescribed treatment was followed by noting whether any medication remained after the prescribed period terminated. Accordingly, plaintiffs have failed to prove their contentions with respect to the alleged failure to record administration of medication to the chronically ill.

Defendants have attempted to systematize their management of chronically ill prisoners. Dr. Williams has taken primary responsibility for the care of illnesses such as diabetes, hypertension and epilepsy. He has instituted a card file of those inmates suffering from chronic diseases, although it was not yet operative at the time of trial. Dr. Frost also testified that he hopes to introduce "the problem oriented medical record" at Bedford Hills in the future.

Since matters of medical judgment generally do not raise a constitutional question absent gross departure from recognized medical standards, *see Estelle v. Gamble, supra* at 103–108, 97 S.Ct. 285, this Court will not decide whether the chosen course of evaluation and treatment of the chronically ill in this case was appropriate. While the Court cannot and does not sanction defendants' unconstitutional failures to carry out physician orders, given that plaintiffs did not prove gross departure from recognized medical standards, it cannot and does not question whether the orders themselves or lack thereof were a medically adequate response to a condition. Accordingly, aside from the earlier found specific instances of unconstitutional failure to carry out physicians' orders with respect to blood pressure readings and lapse in prescribed medication, the Court concludes that plaintiffs' claim that defendants have failed to adopt a systematic course of evaluation and treatment of the chronically ill is not of constitutional dimension.

### D. *Review of Medically Inappropriate Work Assignments*

■ Plaintiffs also contend that inadequate follow-up medical care allows inmates to be given work assignments which are inappropriate to their physical condition. They offer as an example the work assignment of Theresa Durante. Ms. Durante had a hernia operation at another correctional facility in early February, 1975. When returned to Bedford Hills in April, 1975, she was assigned to a cafeteria job which involved lifting large pots and pans. She informed a nurse that she was unable to do work involving heavy lifting. Her chart reveals, however, that Dr. Williams was consulted and he determined that since more than six weeks had elapsed following the surgery, Ms. Durante could do routine work and regular activities. Thus, this example does not sustain plaintiffs' claim. Two other examples, Ms. Bostick and Ms. Mains, likewise fail to support plaintiffs'

contention, as the records of these inmates do not indicate that they wished to be relieved of their assignments. Moreover, their conditions were being followed by physicians. The evidence presented with respect to a fourth example, Ms. Arrufat, is equivocal. She was under a doctor's order to keep one arm elevated. Ms. Daly testified that Ms. Arrufat worked as a translator. Although a note in Ms. Arrufat's chart indicates that she had stated that her work required use of both hands, she never requested relief from her job assignment and there is insufficient evidence that such a change was medically required.

In sum, plaintiffs failed to establish that class members were kept in medically inappropriate work assignments. Moreover, physicians were consulted and they exercised their individual judgments in reviewing the work assignments. Since such matters of medical judgment do not raise a constitutional question, see *Estelle v. Gamble, supra* at 103–108, 97 S.Ct. 285, the Court will not tarry longer on this matter.

## E. Outside Consultation

### 1. Referrals to Specialists

■ As previously noted, Bedford Hills maintains only ambulatory care facilities, and the medical department provides principally primary physician care. With the exception of gynecology, specialty care is provided through visiting consultants, outside consultants and outside hospital clinics.

Consultations with outside specialists are initiated by a referral from a primary care physician at Bedford Hills. Dr. Williams reviews the physician referrals to outside specialists at the time they are brought to his attention by the medical clerk. However, he does not review referrals to outside specialists in cases of emergency. At one time Dr. Williams also reviewed all referrals for outside diagnostic testing, but he was relieved of this practice by Dr. Frost after it was discovered that he had delayed

acting on these referrals for "weeks at a time," resulting in delays in diagnosis.

### a. Individual Cases

In support of their allegation that referrals to specialists are delayed, plaintiffs offered the history of treatment of four cancer or suspected cancer patients.

On November 22, 1974, Ms. Moreland was given a pap test which was reported four weeks later as "suspicious" and with the recommendation that a biopsy be performed. Dr. Saadat reviewed the report approximately one week later and ordered biopsy for after the holidays. A January 28, 1975 notation indicates that Dr. Williams consulted with Grasslands Hospital and determined that an appointment for a biopsy would be made in approximately two weeks. Ms. Moreland was admitted to Grasslands on February 17, 1975 and a hysterectomy was performed when a biopsy revealed that she had cancer which had spread from the cervix to the uterus.

In rebuttal of plaintiffs' contention that Ms. Moreland's case evidences delay on the part of Bedford Hills, defendants' witnesses agreed that the four week delay in the return of the pap report, although customary by Bedford Hills standards, was unreasonable by comparison to private practice.[20] However, defendants'. witnesses testified that the approximately two month delay from the noting of a "suspicious" condition to the performing of the biopsy was not unusual. In this regard, Dr. Williams testified that he immediately tried to have Ms. Moreland admitted to a specialized cancer hospital. Upon its refusal to admit a prison inmate, he arranged for her admission to Grasslands. Dr. Williams further testified that delays in obtaining hospital admissions is a common problem, even in private practice.

Ann Galloway's pap test, taken on February 21, 1975 and reported two weeks later as "suspicious," revealed "marked dysplasia or carcinoma *in situ*." On March 12, 1975,

---

**20.** See section IV(A)(2) *supra* for Dr. Saadat's comparison of the four to five week delays he experienced in the reporting of pap smear results to Bedford Hills, as compared to the approximately one week delays that prevailed in his private practice.

Dr. Saadat reviewed the report and referred Ms. Galloway for a biopsy. She was seen at the Grasslands clinic on March 31, when another pap test was taken and no return appointment was requested. On April 29, the doctor at Grasslands called Bedford Hills to request the return of Ms. Galloway for another pap test. An appointment made for May 5 was cancelled at Ms. Galloway's request. She was seen at Grasslands on May 12, 1975 and the pap test was repeated. On June 11, she was taken to Grasslands for a colposcopy. Grasslands called on June 19, 1975 to report that Ms. Galloway suffered from "severe dysplasia of the cervix," and the physician there recommended a hysterectomy. On June 22, Ms. Galloway was admitted to Grasslands where a hysterectomy was performed.

The Court finds that in neither of these cases was the delay attributable to the staff at Bedford Hills. In the first instance, delay was caused by the state laboratory reporting the results. After receiving the laboratory reports, in each case, the staff at Bedford Hills responded promptly. In Ms. Moreland's case, any further delay resulted from difficulty in gaining a hospital admission—a problem not caused by, and beyond the control of, Bedford Hills. In Ms. Galloway's case, delays resulted from Grasslands' handling of her treatment. Moreover, in these instances, physicians were consulted and they exercised their medical judgment as to how best to proceed in view of the medical findings. Thus, plaintiffs essentially are asking the Court to review the adequacy of the medical judgment, for example, the Grasslands' physician's decision to repeat the pap test rather than immediately perform a colposcopy in Ms. Galloway's case.[21] However, as stated earlier, matters of medical judgment generally do not raise a constitutional question. *See Estelle v. Gamble, supra* at 103–108, 97 S.Ct. 285. For all of the foregoing reasons, the Court finds no constitutional violation in the delayed referrals of two cases of cervical cancer to outside specialists.

Plaintiffs also contend that unreasonable delays occur in the referral for treatment of cases of suspected breast cancer. For example, Nora Arner was seen on November 26, 1974 by Dr. Williams for a breast mass. He referred her to the gynecologist who saw her on December 6, 1975. On December 19, 1975, she was sent to Grasslands for a mammogram which was reported normal. Nonetheless, an outside consultant who saw Ms. Arner on December 19 recommended a biopsy. On December 31, there is a note by Dr. Williams to try to get Ms. Arner an appointment at a specialized cancer hospital. Through January, there are further notes by him to check on her appointment. On January 27, 1975, when it was apparent that the cancer hospital would not admit Ms. Arner, Dr. Williams referred her to Grasslands. She was seen there on February 3 and was scheduled to return three weeks later for a biopsy. On March 4, 1975, she was admitted to Grasslands and a biopsy was performed.

Defendants testified that there was no significant delay in the treatment of Ms. Arner. She had stated that she had had the breast mass for one year. It is apparent from the summary that Dr. Williams acted promptly and stayed on top of her case until she was referred to Grasslands for treatment.

Similarly, Dr. Saadat testified that the two month delay in biopsying Rebecca Booker's breast mass was not unreasonable because it was hard and movable and not the kind of breast mass requiring immediate attention.

The Court concludes that with respect to the two suspected breast cancer cases, although there may have been some delay in performing biopsies, under all of the circumstances these delays were not significant. In each instance, the Bedford Hills physicians were appropriately responsive to the condition and used their best efforts to obtain the best care available for their patients. Consequently, the Court finds no

---

**21.** It is important to note at this juncture that the Court has made its findings of fact solely with reference to the constitutional standards. Whether the treatment provided these women would constitute malpractice is not before the Court.

constitutional violation in the delayed referrals of these suspected cancer patients to outside specialists.

Plaintiffs further contend that referrals to eye specialists are likewise delayed. They point to the case of Gladys Dieppa who was seen by a physician on July 26, 1975 for headaches and a nodule on her forehead. This physician suggested temporal arteritis as a tentative diagnosis and followed her closely. On September 6, he referred her to Dr. Williams who referred her to the dermatologist. The dermatologist saw her promptly and first ruled out a veneral disease pathology. On September 26, 1975, the dermatologist diagnosed the condition as temporal arteritis and referred Ms. Dieppa to an ophthalmologist who saw her the same day.

Rather than exemplifying delay, Ms. Dieppa's case is unusual for the rapidity with which referrals were carried out. Three physicians followed her case and as soon as the more probable pathologies were ruled out and a firm diagnosis was made, she was seen by an ophthalmologist.

Mary Kerr, a diabetic, was admitted to Bedford Hills on July 16, 1974.[22] At that time, she complained that she had headaches, her eyes were "bad", and she needed glasses. On August 9, 1974, she was seen by a Bedford Hills physician for swelling of her left eyelid and poor vision. He referred her to an ophthalmologist; however, she did not receive this consultation until August 27, 1974. The ophthalmologist diagnosed her as suffering from advanced diabetic retinopathy, and recommended photocoagulation treatment.[23] The ophthalmologist saw her again on September 10. On September 25, he called Bedford Hills to indicate that any eye treatment should await completion of the dental work she was re-

ceiving for an infection in her mouth. Apparently he had spoken with the dentist and Dr. Williams and the three together determined that the dental treatment should precede the eye treatment. The dental work was completed by early November, 1974, but apparently her vision had improved. She began to complain of blurred vision again on November 20, but was not taken to the ophthalmologist until December 5, 1974. On December 8, 1974, she was sent to a hospital in New York for photocoagulation therapy, but was returned because the doctors there concluded that her condition had advanced past the point where photocoagulation could be successful. As noted above, Ms. Kerr suffered permanent loss of vision.

In Ms. Kerr's case, there were two delays of over two weeks in referring her to an opthamologist for consultation.[24] There apparently was no good reason for these delays, as Ms. Kerr evidently was suffering from a condition which, if not checked, would result in permanent disability. However, once she was seen by a physician, a consultation was ordered without specifying the date by which it was to be performed. The Court must assume that this constituted the exercise of medical judgment that the condition was not acute. After she was examined by the opthamologist, the primary reason for the further delay in treatment was what appears in hindsight to have been the possibly poor judgment to postpone treatment until completion of some dental work. Regarding the delay after the dental work, the opthamologist was at that point familiar with Ms. Kerr's condition and the Court must assume that his failure to schedule her for an earlier date likewise constituted a medical judgment. As stated previously, matters of

---

22. Many of the following facts of Ms. Kerr's case are also discussed in relation to Admission Health Screening, section I *supra*.

23. Diabetic retinopathy is a serious and degenerative disease which is characterized by bleeding into the vitreous, and possibly resulting in the eventual detachment of the retina and consequent blindness. In its early stages, it may be treated with laser beam therapy (photo-

coagulation). But once the disease advances, the condition cannot be treated.

24. In addition, over three weeks elapsed between the time of this diabetic's first eye complaints upon her admission on July 16, 1974, and when she first saw a doctor on August 9, 1974, the sort of delay this Court has already found to be unconstitutional.

medical judgment generally do not raise a constitutional question, absent proof of gross departure from accepted medical standards. *See, e.g., Estelle v. Gamble, supra* at 103–108, 97 S.Ct. 285. Since no such proof was introduced by plaintiffs, the Court has concluded that it is precluded from finding a constitutional violation in the unfortunate, delayed treatment of Ms. Kerr.

Plaintiffs also cite the cases of Ms. Hapeman and Ms. Johnson. In Ms. Hapeman's case, Dr. Williams was not satisfied with the judgment of the local ophthalmologist and, accordingly, sent her for specialty care to a New York City hospital. In Ms. Johnson's case, when the local optometrist could not see her, Dr. Williams immediately sent her to a hospital. Thus, these two cases evidence concern on the part of Bedford Hills physicians. Nonetheless, delays occurred in these two cases, apparently as a result of administrative and communication problems: the nurse did not bring Ms. Hapeman's condition to a physician's attention for two days; Ms. Johnson went on furlough and her return and lack of treatment was apparently not brought to Dr. Williams' attention. However, since the physicians did all they could, as quickly as they could, the Court finds that whatever delay there was in these two cases was not unreasonable in light of all the circumstances.

In sum, plaintiffs have failed to prove significant and unreasonable delays in referrals to eye specialists. The Court's finding that any delay which occurred in the Kerr case resulted from the medical decision that her condition was not acute is bolstered by contrasting the immediate response to a condition diagnosed as acute in the Hapeman case. Therefore, the Court finds no constitutional violation in the delayed referrals to eye specialists.

As another example of delay in referral to outside specialists, plaintiffs cite the case of Rosemary Cutshaw. A psychiatrist at Bedford Hills noted in Ms. Cutshaw's chart on July 30, 1974 that he suspected she might be suffering from carotid artery disease. He suggested that a neurological work up and arteriogram might be indicated. Apparently his note was never picked up by the medical doctors, because this suggested diagnosis was not followed-up until plaintiffs' expert wrote to Dr. Frost. On May 1, 1975, Dr. Frost met with a physician at Bedford Hills and recommended the referral. However, she was not seen in the Grasslands medical clinic until May 16. On May 18, she fainted and was admitted to Grasslands. Upon her discharge from Grasslands in June, she was given a July 11th appointment in the cardiac clinic. Despite the fact that she was in sick wing in July because of chest pains, this appointment was not kept. No record of a visit to the cardiac clinic is contained in her chart through October 6, 1975, and no explanation of the failure to bring her to the cardiac clinic is contained in the record.

In the Court's view, the basis for this claim that there are unreasonable delays in obtaining access to outside consultants is that physicians ordering the referrals fail to specify the date by which the consultation should have occurred.[25] To substantiate their claim, plaintiffs must rely on the physicians' judgment that an outside consultation is necessary. At the same time, however, they ignore the fact that the physicians' decision to treat the case as acute or chronic, which affects how quickly the consultation is scheduled, also constitutes the exercise of medical judgment. Although the failure to follow physicians' orders violates the Constitution, the physicians' failure to order a particular course of treatment generally does not, absent proof of gross departure from generally accepted medical standards, justify a finding of a violation of plaintiffs' constitutional rights.

Ms. Cutshaw's case is illustrative. The failure to bring her to the cardiac clinic for her scheduled appointment, or as soon

---

**25.** The failure to specify the period within which the consultation should be scheduled is discussed further in section IV(E)(1)(b) *infra*.

thereafter as possible, is an unconstitutional violation of a physician's order. But the May 1 referral which failed to specify that an immediate or more rapid referral to Grasslands was required does not violate the Constitution since plaintiffs did not prove that the failure to so specify constituted gross medical misjudgment. When the evidence is viewed in this light, it is apparent that plaintiffs have failed to prove through the individual cases they cited that referrals to outside specialists are unconstitutionally delayed.

### b. *Statistical Evidence*

However, plaintiffs also presented statistical evidence that outside consultations are delayed. In January, 1975, forty-seven consultations were ordered, but more than 25% of them had not taken place by March 31, 1975. Of those that took place, the average wait was approximately two weeks. In May, 1975, there were thirty-two referrals to outside specialists. Once again 25% had not taken place three months later. For those that did take place, the average wait was approximately three weeks. In July, 1975, of forty-four outside referrals ordered by Bedford Hills physicians, nearly one-third had not taken place within three months, and of those that had, the patients had waited, on the average, 52 days for their appointments.

The only counter-evidence defendants introduced was the number of outside appointments conducted in the approximately two and three-quarter years preceding this lawsuit. They in no way responded to the delays which plaintiffs proved members of the class experienced.

The Court finds that plaintiffs proved statistically that on the average 25% of outside consultations ordered are not performed within three months. However, the Court does not know the nature of the illnesses which precipitated these referrals. Consequently, it does not know whether there was need for haste, and, in turn, whether the delays were unreasonable in light of the medical circumstances of the cases. In addition, when a Bedford Hills physician orders a referral to an outside specialist, he does not specify a precise date or a period within which outside consultation should take place. Without passing on the adequacy of this practice, the Court merely notes that as a result of this practice it is more difficult for the Court, and perhaps also for those involved in arranging the ordered consultations, to determine how much haste is required and how much delay is unreasonable. Thirdly, since even in private practice it is difficult for a patient and physician to arrange for a prompt specialist consultation, the Court can only conclude that it is to be expected that Bedford Hills inmates will experience some delay in gaining access to outside specialists. For these three reasons, the Court cannot find that the statistically proven delays were inordinate.

In sum, plaintiffs did not prove, either by use of general statistics or by use of individual cases, that defendants systematically cause inmates to suffer unreasonable delays in obtaining access to outside specialists. Accordingly, the Court finds no constitutional infirmity in the procedure for referrals to outside specialists.

### 2. *Referrals for Elective Surgery*

 Referrals for what is defined as "elective surgery" must be approved first by Dr. Williams and then by Dr. Frost. Dr. Frost could give no precise definition of elective surgery beyond that it is non-urgent surgery. It could include conditions which are physically distressing, but not permanently disabling or life-threatening. Plaintiffs contend that these review requirements inhibit surgical consultations for painful conditions. As an example, they point to the case of Theresa Durante who was seen by Dr. David on September 8, 1975 for complaints of pain in the vicinity of her previous hernia repair. Dr. David noted a swollen mobile mass, diagnosed it as an enlarged lymph gland, and treated it with penicillin. This treatment and Dr. David's observation of its effectiveness continued until October 17, 1975. When he observed that the tender mass persisted at that time, Dr. David ordered a surgical

consultation as soon as possible. However, after being informed by Dr. Williams that the surgery would be elective, he decided to wait. Ms. Durante continued to complain of pain, but only after receiving a letter from Ms. Durante's attorney regarding her condition did Dr. David again refer her case to Dr. Williams. On November 21, Dr. Frost called Bedford Hills and instructed the staff to have Ms. Durante sent for a surgical consultation. On December 31, 1975, she was finally seen at another correctional institution by a surgical consultant who diagnosed a small hernia and placed her on the elective surgery list. As of the date of trial, she had not undergone surgery, and testified to continued pain.

Likewise, Donna Foggie was seen for stomach pain on June 14, 1975 by a physician who noted a swelling and recommended a surgical consultation for what appeared to be a hernia. This suggestion was repeated by him on July 26, when he noted continued stomach swelling. She was seen on August 29 by a different doctor who, noting a three centimeter mobile mid-epigastric mass, also recommended referral for a surgical consultation. Dr. Williams noted on September 3, 1975 that such a consultation would be for elective surgery only. As of December 1975, no surgical consultation had been scheduled.

The Court finds that an elective surgery referral procedure which requires review by a second or even third physician after the examining physician has determined that surgery is required is not in itself unconstitutional, notwithstanding the delay engendered by such a procedure. In reaching this conclusion the Court is not unmindful that even in private practice, a second opinion nowadays is considered wise, and for insurance purposes perhaps necessary, before a patient agrees to undergo elective surgery. Further, the Court is aware that whether or not a second opinion is sought, delays in obtaining hospital admission for elective surgery are not unknown in private practice. For these reasons, the Court does not now find unconstitutional either the procedure requiring concurrence by a second or third physician before an elective surgery referral is made, or the attendant delay.

Nonetheless, the Court does condemn the practices which resulted in Dr. Williams' denying Ms. Foggie a consultation despite referrals by two examining physicians, and Ms. Durante obtaining a consultation only because her attorney had intervened. Specifically, the Court criticizes first the broad definition of elective surgery for failing to differentiate between those who are and those who are not suffering physical discomfort which would be alleviated by the surgery. Second, the Court questions whether all of the delay in these two cases was attributable to a combination of the requirement of second and third opinions, and the general difficulty even private practitioners have obtaining such consultations for their patients, or whether some of the delay was inexcusable. Third, the Court questions whether the reviewing physicians (Drs. Williams and Frost) actually exercise informed medical judgment as to the necessity of a timely consultation and whether in so reviewing they give serious consideration to the examining physician's opinion; or, do Drs. Williams and Frost simply override the examining physician's opinion without exercising independent medical judgment or without giving due regard to the examining physician's opinion?

The procedure for referring inmates to outside elective surgery consultations would be unconstitutional if categorizing the surgery as elective were to mean that the consultation would routinely be denied or delayed irrespective of the discomfort to the inmate and irrespective of the examining physician's opinion. Although the Court does not find that plaintiffs have proven this to be the case at Bedford Hills, plaintiffs' proof does move the Court to urge adoption and application of a definition of "elective" that accounts for the inmate's physical distress.

## CONCLUSION

In conclusion, the Court would like to state that it was not unfavorably impressed

with the individual members of the Bedford Hills medical staff. They appeared to be truly concerned with the well-being of the inmates they served. Further, the Court agrees with the defendants that the medical care provided at Bedford Hills is nowhere near as shockingly inadequate as that provided in other institutions described in the cases cited in this opinion. Moreover, the Court agrees that there are many fine, dedicated doctors and nurses employed, that outside specialists are available, that there is a system of referral to nearby hospitals, and that adequate medical care is often provided at Bedford Hills.

Nonetheless, the administrative and record keeping procedures at Bedford Hills are grossly inadequate. Moreover, it concerns the Court that to date no one has taken responsibility for auditing the system to evaluate its ability to deliver care to those in need. The Court suspects that the one and only thorough review of the medical delivery system at Bedford Hills occurred only as a result of this lawsuit. For these and other reasons heretofore set forth, care does not regularly reach all those in need.[26]

The result—the denial of necessary medical care for substantial periods of time—is the same as in the more obviously egregious systems exemplified in the cases cited in this opinion. If the result is the same, the Court perceives no legal significance to the difference in cause, except insofar as it affects the necessary remedy.

The foregoing constitutes the findings of fact and conclusions of law of the Court for the purposes of Rule 52, Fed.R.Civ.P.

### REMEDY

Within thirty days of the date of this opinion, plaintiffs' and defendants' counsel shall meet and within ten days thereafter shall report to the Court their progress in reaching agreement on new means and procedures for:

1. Providing better access to medical providers by inmates in sick wing;

2. Conducting sick call which provides adequate nurse screening and reasonably prompt access to a physician;

3. Insuring that ordered laboratory work is reported and followed-up and medical reappointments are scheduled;

4. Periodic self-audits of the performance of the medical care delivery system, and record keeping procedures conducive to such audits.

It is so ordered.

---

**26.** Defendants were not required to show that the medical system operated perfectly. Likewise, plaintiffs were not required to prove that it never worked. Plaintiffs proved sufficient instances of non-delivery of necessary medical care to convince the Court that the noted aspects of the system are grossly inadequate and unnecessary suffering inevitably results.