Mary **DEAN, et al.,** for themselves and all others similarly situated, Plaintiffs,

v.

Thomas A. **COUGHLIN III, et al.,** Defendants.

No. 84 Civ. 1528 (SWK).

United States District Court, S.D. New York.

Dec. 3, 1985.

William E. Hellerstein, Legal Aid Soc. by William J. Rold, Ellen D. Levine, Claudette R. Spencer, New York City, for plaintiffs.

Robert Abrams, Atty. Gen. N.Y. by Melvyn R. Leventhal, Deputy First Asst. Atty. Gen., Douglas D. Aronin, Frederic L. Lieberman, Asst. Attys. Gen., for defendants.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Plaintiffs, who represent a class consisting of all persons who are or will be confined at Bedford Hills Correctional Facility ("Bedford Hills") during the pendency of this case, bring this action pursuant to 42 U.S.C. § 1983, claiming that the dental care provided at Bedford Hills violates their rights under the Eighth and Fourteenth Amendments to the United States Constitution.

Named as defendants are: Thomas A. Coughlin III, the Commissioner of the New York State Department of Correctional Services, Raymond Broaddus, Assistant Commissioner for Health Services of the New York State Department of Correctional Services; Sydney Pollard, Dental Director of the New York State Department of Correctional Services; Frank Headley, Superintendent of Bedford Hills; Jimmie Harris, Health Administrator of Bedford Hills; and Stefan Sherman,[1] dentist at Bedford Hills. Plaintiffs allege a complete breakdown of dental services at Bedford Hills, characterized by the failure to examine inmates when they arrive and when they request routine care, a long backlog in examining inmates who seek emergency care, and the failure to schedule follow-up appointments ordered by the facility dentist. Plaintiffs allege that as a result of this breakdown, Bedford Hills' inmates have suffered pain and permanent damage to their health.

This case is presently before the Court on plaintiffs' motion, pursuant to Rule 65 of the Federal Rules of Civil Procedure, for a preliminary injunction ordering defend-

---

1. In the original complaint, Thomas Collings was named as a defendant in his capacity as dentist at Bedford Hills. Dr. Collings has since left Bedford Hills, and his replacement, Dr. Sherman, has been substituted as a defendant. Dr. Sherman testified extensively at the hearings. The Court finds, based on its direct observation of the witness and consideration of all the other evidence adduced at the hearing, that Dr. Sherman was for the most part not credible and his answers were generally evasive and incomplete.

ants to provide adequate dental care to inmates at Bedford Hills.

## FINDINGS OF FACT

### I. *Background*

The Bedford Hills Correctional Facility is the largest state correctional facility for women in New York, housing approximately 570 to 600 inmates. It is also the only maximum security prison for women in New York. It serves as both a permanent correctional facility for some inmates, and a reception center for all women felons in New York State, regardless of where they are eventually to be incarcerated. According to the New York State Department of Correction Services policy guidelines for dental services[2], the dental clinic at Bedford is responsible for giving an intake examination to all new inmates, whether they are to be incarcerated permanently at Bedford Hills or elsewhere, and performing preventive, prophylactic, and other routine dental services for permanent Bedford Hills inmates. The clinic consists of two operatories, which consist of a chair, light, instrument table, and cuspidor. The staff is presently composed of one full-time dentist, two part-time temporary dentists, one dental hygienist, and one clerk.

### II. *Administration of the Dental Clinic*

#### A. *Initial Screening*

The first step in the provision of dental care at Bedford Hills is the initial screening exam which is to be performed on all incoming inmates. The exam is performed either by the dental hygenist or the dentist, and consists of taking the patient's medical history and charting her teeth. The purpose of this exam is threefold: to identify inmates, to identify problems needing attention, and to detect and treat emergency conditions. Both the defendants' and plaintiffs' prison dental experts testified that it is good prison dental practice to perform initial exams within fourteen days. Bedford Hills' regulations also call for initial exams within fourteen days.

As Dr. Sherman, the Bedford Hills dentist testified, however, inmates can wait four months or more for an initial screening, and the record is replete with examples of inmates who waited at least four months for initial exams. For example, Mary Jenkins arrived at Bedford Hills in August, 1984 and was not seen until January, 1985, a period of five months, during which she made numerous requests for treatment. Kathy Boudin stated in an affidavit that she arrived at Bedford Hills in May, 1984 and was not seen until December, 1984 and her dental chart confirms this.

The record also establishes that some patients have never received an initial screening examination or any other examination. Clara Karnbach, who arrived in September, 1983, has never been examined, and Dr. Sherman, in his affidavit, indicated he could not locate a chart for her. The Court also finds that Elizabeth Roman, who made numerous requests to see the dentist and whose chart defendants could not locate, also has never been examined by the dentist.

While some inmates, such as Maureen Ragsdale, who arrived at Bedford Hills on June 21, 1984 and was examined that month, are seen promptly, many are not. The failure to give initial examinations to so many inmates prevents the dental clinic from establishing an orderly and efficient system for delivering dental services to inmates. Without carrying out prompt initial screening examinations on all inmates, the clinic has no way to prioritize the inmates' dental needs. The dentist does not know which inmates need immediate attention for pain, and which inmates need care that can wait. As defendants' own expert,

---

2. There was some dispute as to the effect of these guidelines. Defense witnesses maintained that they set forth goals and aspirations for prison dental facilities, while plaintiffs often used them as a standard against which to measure defendants' performance. Without attempting to resolve that conflict, the Court notes that it is referring to the guidelines for descriptive purposes only, and not as a means for judging the adequacy of care at Bedford Hills. The Eighth Amendment, and not these guidelines, is the Court's sole standard.

Dr. Conte, testified, the initial screening exam should set up the entire classification system for an orderly treatment of dental patients in a prison.

### B. *Requests for Routine Care*

According to the defendants' guidelines, policy memoranda, and testimony, routine dental care includes examinations, fillings, cleaning, extractions, dentures, root canal, and gum treatment. Inmates request routine care by filling out "Request for Dental Appointment" forms, and by returning them to a member of the dental clinic, who places names on waiting lists and schedules appointments. The dental clinic is then supposed to acknowledge receipt of the request and send an appointment date to the inmate.

The Court finds that the system for providing routine care at Bedford Hills is defunct. Dr. Sherman admitted that he does not use the request forms, which he characterizes as worthless. Della Sutton, the dental hygienist, places the requests in a gauze box, and does not use them. The clinic does not send acknowledgements, make appointments or compile waiting lists. In fact, over three hundred request forms or notes seeking appointments have been filed since January, 1984, and nothing has been done with them. Defendants' own expert, Dr. Conte, stated that a prison dental clinic's failure to respond to over 300 requests for routine care would present a problem. The Court agrees. The dental clinic's failure to answer these routine requests for care both denies inmates treatment and forces them to seek care outside of normal channels.

### C. *Requests for Emergency Care*

Dr. Sherman defines a dental emergency as swollen or infected gums, a broken denture, or pain in the teeth or mouth. The defendants' guidelines for requesting emergency care, as well as a memo to the inmates, describe Bedford Hills' system for providing emergency care. Inmates needing emergency care are to sign up on the nurse's screening list or sick call sign-up sheet, both of which are posted every morning in the housing units. The lists are examined to determine which complaints are real emergencies, and the dental hygienist is then responsible for arranging for the emergency patients to see the dentist. Inmates are informed that they can request emergency care at night and on weekends and are warned not to use the emergency sign-up sheets to make appointments for routine care.

As with the system for requesting routine care, the process for requesting emergency care at Bedford Hills has broken down. Inmates sign the daily sick call sign-up sheets or the nurse's screening list, but are not seen for months. For example, Helen Richardson signed up for emergency care sixteen times between October, 1984 and March, 1985. She was never called to see the dentist. Shirley White signed up for emergency care on March 20, 1985 and has not been seen by the dentist. Laura Whitmore signed the sick-call sheet on February 25, 1985 but has yet to see the dentist. Mary Jenkins, who lost a tooth from a lower denture, requested emergency care ten times between August, 1984 and January, 1985 before finally seeing the dentist. Hannah Coch requested emergency assistance thirteen times in March, 1985 but has not been seen.

Defendants admit that there are long delays in treating inmates who request emergency care. Dr. Sherman stated that it often takes him three days to see all the patients on one day's emergency list. At first glance, this might not seem problematic. However, Dr. Sherman stated that as of April, 1985, he was still working on the emergency list from February, 1985. Dr. Conte, the defendants' expert, stated that in light of this backlog, Bedford Hills does not really have a system for treating patients who need emergency care. The Court agrees.

Defendants, while admitting that there are long delays in providing treatment to inmates who request emergency care, assert that most patients who request emergency care are not emergencies at all, but

use the nurse's screening and sick call sheets as a means of requesting routine care. To support this contention, defendants state that while many inmates sign up for emergency care during weekday mornings, few sign up at night or on weekends. Defendants also claim that inmates abuse the emergency sign-up process, and point to inmates such as Miriam Acevedo who testified that she signs up for emergency care even when she is not in pain. Thus, defendants essentially state that they use the emergency request list as a means of providing routine care because patients on the emergency list need only routine care. However, since the clinic has not even seen many of the patients on the list, it has no way of knowing which inmates warrant emergency treatment.

Defendants' attempt to blame the inmates for the backlog in emergency care is also misplaced. Lacking screening exams and responses to routine care requests, inmates understandably realize that the only way to receive dental treatment is to request emergency care, whether they need it or not. The backlog in emergency care is thus the result of the breakdown in initial screening and routine care procedures.

### D. *Follow-up Appointments*

The record also indicates that the dental clinic is lax in scheduling and keeping follow-up appointments ordered by the dentist. For example, Miriam Acevedo's dental chart indicates that during the course of treatment for a cap on her tooth, the dentist ordered four follow-up visits, none of which were kept on time, and for one of which Acevedo waited one year. During this time, the record indicates Acevedo made numerous requests for dental care, including personal visits to the dentist, but was not seen for treatment. Karen White, who was treated for sinitis, was scheduled for follow-up care within one to two days, but was seen nine days later. Her dental chart indicates she was in pain throughout that period. Ruth Kitchens was treated for a broken tooth on April 18, 1984; the dentist ordered another visit in one week,

but did not see her for eight months. She testified that she was in pain while waiting to see the dentist. Dr. Sherman, while testifying that the follow-up care system was working properly at Bedford Hills, admitted that there was no record that he saw inmates Sondra Halpin, Estella Coronado, Miriam Acevedo, Lydia Cerillo, and Debra Buford, among others, within the time ordered for follow-up care.

The record indicates there are occasions when patients see the dentist for a follow-up visit within the time ordered. Helen Richardson, for example, testified on cross-examination that she saw Dr. Sherman for a check-up three days after a tooth was removed. But such examples do not mitigate the damage and pain caused by the series of failures to provide follow-up care. Nor do they indicate that the system of follow-up care is working properly at Bedford Hills.

### E. *Summary*

The above findings demonstrate a total breakdown in the administration of the dental clinic at Bedford Hills. The failure to perform initial exams, the collapse of the system for requesting routine care, the backlog in emergency requests, and the failure to keep follow-up appointments all create a labyrinth in which inmates at Bedford Hills, facing sundry obstacles, use various means to see the dentist in the hope that although many of their attempts will fail, they will eventually obtain treatment. Besides signing up for routine and emergency care, inmates are forced to go outside the regular prisoner process to get treatment. They request the help of prison health administrator, Jimmie Harris, accost Dr. Sherman in the hallway, write letters to both, and visit the clinic without appointments. Some inmates negotiate their way to treatment, but in no apparent relation to their needs.

Defendants attempt to use these examples to demonstrate that the dental chair is accessible and that inmates are being treated. But under such an anarchical system, many inmates—be they quiet or even un-

lucky—have suffered while awaiting the treatment that could relieve them, while others who do not need immediate treatment have been seen. Maureen Ragsdale, Clara Karnbach, Laura Whitmore, Dawn Boykin, and Mary Jenkins all testified that they were in pain while waiting months for requested treatment.

### III. *Provision of Dental Services*

The dental services offered by the clinic at Bedford Hills can be divided into four categories: prophylactic care, restorative care, extractions, and prosthetics services. The evidence demonstrates that the collapse in the administration of the Bedford Hills dental clinic has caused a breakdown in the provision of dental services.

### A. *Prophylactic Care*

Prophylactic treatment for teeth is a special cleaning which only a dentist is able to provide. Plaintiffs' expert, Dr. Villacara, stated that wise dental policy calls for prophylactic treatment once every six months. Failure to provide timely and consistent care can lead to inflamed and bleeding gums, periodontal disease, and loose or lost teeth. Such disease would not begin to develop, according to Dr. Villacara, until at least a year after the last treatment. Thus, as defendants' expert Dr. Conte testified, prophylaxis is not a priority treatment, but it is important. The record indicates that Bedford Hills generally does not provide regular prophylactic care to the inmates.

Helen Richardson has not had her teeth cleaned since her arrival at Bedford Hills in March, 1984. Her dental records indicate that the clinic ordered a cleaning in July, 1984. Miriam Acevedo has not had her teeth cleaned in three years. Virginia Maddox has not had prophylactic treatment in her four years at Bedford Hills. Dawn Boykin has not received a cleaning since her arrival at Bedford Hills in May, 1983, even though the dentist noted on her record that she needed one in July, 1984. The evidence thus indicates that Bedford Hills rarely provides prophylactic care to inmates.

### B. *Restorative Care*

Restorative services generally include filling cavities, doing root canal work, and crowning broken teeth. Failure to perform restorative work when needed can result in pain and the loss of teeth. The record indicates that there are often unacceptably long delays in the provision of restorative service at Bedford Hills.

Maureen Ragsdale was diagnosed as possibly needing crowns on July 5, 1984. On November 11, 1984 she visited the dentist because the teeth needing crowns had fractured. The dentist did not begin to insert the crowns until February 20, 1985, nearly seven months after the need for crowns was first identified, and three months after her tooth had cracked. Ragsdale testified that during the time she waited for treatment she was suffering from pain and throbbing in her teeth, and headaches.

According to Dr. Villacara, plaintiffs' expert, if the crowns had been inserted immediately in July, the tooth would not have fractured. Dr. Sherman stated in an affidavit that the need to perform the services was not diagnosed as definite until November and that the patient would have been helped on January 17, but she did not show up at the clinic. Even accepting both of Dr. Sherman's assertions as true, Ragsdale still waited in pain for two months for treatment diagnosed by Dr. Sherman himself as necessary. Clara Karnbach testified that while incarcerated she had cavities needing fillings and that her wisdom teeth often caused her pain. As the Court found earlier, Clara Karnbach has never seen a dentist at Bedford Hills, despite many requests for appointments.

Many other patients have been diagnosed as having cavities but have not received fillings. Linda Green has waited eight months, Luba Mack has waited ten months, and Estella Coronado has waited one year and four months for fillings. These are but a few examples from the record.

Inmate Dawn Boykin was having problems with her upper right middle tooth when she saw the dentist on August 30, 1983. The clinic took x-rays of her tooth three times because it lost them twice. She finally was diagnosed as having a cavity, and it was filled in December, 1983, but the tooth had to be pulled in May, 1984. The witness testified that throughout this period, including the time after the tooth was pulled, she was in pain. She also unsuccessfully sought dental attention numerous times.

In July, 1984 Boykin was diagnosed as needing a crown on one tooth and suffering from a deep carious lesion and mesial decay on two others. She testified that her teeth hurt so much she often cried. Plaintiffs' expert testified that failure to treat a deep carious lesion could result in further decay and eventual loss of the tooth. Despite making thirteen requests to see the dentist, she was not treated until December 7, 1984, a period of nearly five months. She did see the hygienist on September 5, but received no treatment. When she saw the dentist for treatment on December 7, she claimed that while Dr. Sherman was examining her, he became too familiar with her, and Dr. Sherman suggested that she come back for treatment another time.

The Court finds that Dr. Sherman was only attempting to examine Boykin when she claimed he became too familiar with her. So the failure to treat Dawn Boykin on December 7 was due to an unfortunate misunderstanding between doctor and patient. However, this incident in no way justifies the five months Boykin waited for treatment between July and December.

### C. *Extractions*

Shirley White's dental record indicates that on September 4, 1984, she needed three teeth extracted. One of these teeth was apparently on her sinus line, and she was in pain. Dr. Sherman indicated on her chart that she was to be seen in approximately seven days. Two months later she

was transferred to Albion State Prison without having been seen and thus without having the teeth pulled. She returned to Bedford Hills a year later in November, 1984 and has still not seen the dentist, despite two requests. There is no record that the teeth were ever pulled. Currently, she is suffering from sore gums and cannot eat meat.

Karen Jamison's dental chart indicates Dr. Sherman diagnosed her as needing two teeth extracted on July 19, 1984. One tooth was filled seven months later, the other has never been filled according to her chart, although Dr. Sherman states in an affidavit that it was filled on April 23, 1985. Even assuming his statement is true, she waited nine months for all fillings to be completed. Among the many other inmates who have waited months for extractions are Marie Smily and Rosaura Gonzalez, who are still waiting for extractions after waiting ten and five months, respectively.[3]

The Court finds, based on the expert testimony adduced at trial, that failure to perform needed extraction within a reasonable time can result in unrelieved pain and, if the delay is long enough, infection and damage to the roots and jawbone. Dr. Sherman claimed in his testimony that only one percent of patients needing extractions ever suffer from infection. Even if the Court accepts this as true, the fact that so few people suffer infection is no excuse for long delays in performing needed extractions. Furthermore, even if a patient needing an extraction does not develop an infection, she would almost always be in pain.

### D. *Prosthetic Services*

Prosthetic services encompass replacing teeth that are missing. There are two basic sorts of prosthetic devices—fixed and removable. Fixed prosthetic devices are commonly known as bridges and removable prosthetics are known as dentures. Dr. Villacara and Dr. Conte agreed that a per-

---

**3.** Gonzalez was transferred to Albion Correctional Facility in December, 1984. This does not mitigate the failure to treat her in the five months between the diagnosis and transfer.

son in need of dentures would have difficulty chewing food, which would in turn lead to digestion problems. Dr. Villacara also stated that the facial distortion resulting from missing teeth could lead to psychological problems. Dr. Conte stated the provision of dentures is the second dental priority in the New Jersey State Prison System, and that it should take from one to six months for a denture case to be completed. The record indicates that, as with other dental services at Bedford Hills, the provision of prosthetics is severely lacking.

Ruth Kitchens' dental chart indicates that she needed partial upper and partial lower dentures as of April 18, 1984. She testified that the hygienist recognized her need for dentures during a visit in December 1983, but the first time a dentist entered such a diagnosis on her chart was in April, 1984. She finally received a transitional denture in April, 1985, after a year's delay. ·

Mary Jenkins has full upper and lower dentures. In August, 1984 she lost a tooth from her lower denture. When she eats, particles of food go straight through the hole left in the denture and irritate her gums. As a result, she cannot eat properly. She had made numerous requests for a dental appointment, but was not seen until January 22, 1985. At that visit, Dr. Sherman asked Jenkins to leave the dentures for repair, but the dental chart and Dr. Sherman's affidavit indicate that she refused to leave them. Jenkins testified that she refused because Dr. Sherman claimed the repairs would not work and that she needed new dentures anyway. The Court finds that her refusal to leave the denture for repair was reasonable because if she had, she would not have had any lower teeth.

Inmate Penny Rose's need for full dentures was identified on October 29, 1983. All of her teeth were extracted by December, 1983. Dr. Sherman testified that she then should have waited six to eight weeks before impressions for dentures were taken in order to let her mouth recover. The impressions were not taken until July, 1984, a full seven months later, and she did not receive the dentures until March, 1985, eight months after the impressions were taken and fifteen months after she was first diagnosed as needing dentures. During the time she was without teeth, the record indicates she lost fifteen pounds and was placed on Sustacal, a food supplement. Dr. Sherman asserts that the delay in taking the impressions was due to recurring cold sores. But no cold sores were indicated on her record between December, 1983 and June, 1984, and in fact she did not even see the dentist during this time. Cold sores should not cause a seven month delay. Cold sores were noted on Rose's chart on June 26, 1984, and she received impressions less than a month later. Thus, if the clinic acted immediately after a case of cold sores was over, it could have taken the impressions sooner. Even if the Court accepts Dr. Sherman's assertions that cold sores prevented impressions from being taken, this does not explain the eight month gap between the taking of the impressions and the insertion of the dentures.

The record indicates that these are not isolated incidents, but are part of a pattern of delay in the provision of prosthetic care at Bedford Hills. For example, Peggy Southerland waited one year for full upper and lower dentures, Kathleen Riley has waited fourteen months for partial upper and lower dentures that have yet to appear, and Lydia Cirillo has waited eighteen months.

## IV. *Efforts to Improve the Quality of Care at Bedford Hills*

The defendants admitted during the hearings that the provision of dental care at Bedford Hills has not been sufficient, but they claim they have tried to and have, in fact, improved the care at Bedford Hills. The record shows that defendants have made a number of requests to the State for additional staffing at Bedford Hills. In September, 1982, Health Services Administrator Jimmie Harris wrote a memo to the Regional Director seeking permission to hire a dental assistant at Bedford Hills.

Dr. Broaddus wrote memos in support of this request in October and November, 1982. In February and March, 1984, Harris sought a temporary dentist for Bedford to help clear up the backlog that developed under Dr. Collings. A temporary, half-time dentist was approved by the state in November, 1984.

The State has also provided Bedford Hills with a mobile health service unit which includes an additional half-time dentist. The dental assistant request has not been approved by the State, but the clinic has added a clerk to help with record-keeping. Defendants also have plans to improve and expand the physical facilities at the dental clinic. The plans call for expanding the clinic so that it will contain four operatories. Physical construction for the operatories has not yet begun. The Court notes that all the improvements have been implemented after the institution of this lawsuit. Furthermore, these efforts have not resulted in improvement of the provision of dental services at Bedford Hills.

## CONCLUSIONS OF LAW

In order to obtain a preliminary injunction in this Circuit a party must demonstrate:

> (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Jack Kahn Music Co. v. Baldwin Piano and Organ Co.*, 604 F.2d 755, 758 (2d Cir. 1979).

■ When a party is seeking a mandatory preliminary injunction, as plaintiffs do here, the standard for the second prong of the test is even higher. *Jacobson and Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438, 441 (2d Cir.1977). The moving party must make a clear showing that it is entitled to the relief it requests or that extreme and serious damage would result from a denial of preliminary relief. *Abdul Wali v.*

*Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985). And when, as here, the preliminary injunction will grant the moving party substantially all the relief it ultimately seeks, the party must fulfill an even more stringent standard. It must show a substantial likelihood of success on the merits. *Wali*, 754 F.2d at 1026.

### I. *Substantial Likelihood of Success on the Merits*

A federal district court faces the prospect of enjoining prison officials to provide certain services to inmates with some trepidation. This Court recognizes that it is not an expert in prison administration and is not in command of all the resources necessary to resolve prison problems. *See Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). The Court thus must give due deference to the judgment prison officials have exercised in establishing prison procedures. The Court must not simply implement its own idea of the ideal way to run a prison. *See Bell v. Wolfish*, 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979).

The Court recognizes also, however, that it is required to act if it finds that the federal constitutional rights of the Bedford Hills inmates have been violated. When dental or medical needs are involved, an inmate is completely reliant on the state and prison for care. When the care is not forthcoming, a court is often the only place an inmate can turn for help. With this tension between individuals' rights and the limited role a court plays in prison reform in mind, the Court turns to the merits.

### A. *The Eighth Amendment Standard*

■ The Eighth Amendment to the Constitution of the United States requires a state to provide medical care to those whom it punishes by incarceration. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), *reh. den.*, 429 U.S. 1066, 97 S.Ct. 798, 50 L.Ed.2d 785 (1977). A state's obligations applies to dental care as well. *Chapman v. Rhodes*, 434 F.Supp. 1007, 1020 (S.D.Ohio 1977), *aff'd*, 624 F.2d

1099 (6th Cir.1980), *rev. in other part,* 452 U.S. 337, 344, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981); *Barnes v. Virgin Islands,* 415 F.Supp. 1218, 1235 (D.V.I.1976). In numerous other cases, courts have applied the Eighth Amendment to dental care at prisons. *See, e.g., Fields v. Gander,* 734 F.2d 1313, 1314 (8th Cir.1984); · *Robbins v. South,* 595 F.Supp. 785, 788 (D.Mont.1984); *Shaffer v. McWilliams,* 570 F.Supp. 1422 (W.D.N.Y.1983); *Clifton v. Robinson,* 500 F.Supp. 30, 35 (E.D.Pa.1980); *Nicholson v. Choctaw County,* 498 F.Supp. 295, 297 (S.D.Ala.1980); *Stokes v. Hurdle,* 393 F.Supp. 757, 761 (D.Md.1975), *aff'd,* 535 F.2d 1250 (4th Cir.1976).

■ A state is not required to fulfill all of the dental or medical needs of its prisoners. Rather, it must not be deliberately indifferent to the "serious medical needs of the prisoners...." *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291. The two relevant questions under the Eighth Amendment are thus what constitutes deliberate difference and what is a serious medical or dental need. *See Harding v. Kuhlmann,* 588 F.Supp. 1315, 1316 (S.D.N.Y.1984) (to make a claim under the Eighth Amendment, plaintiff must show allegations of serious medical needs and deliberate indifference on the part of the prison officials to those needs) (Weinfeld, J.), *aff'd,* 762 F.2d 990 (2d Cir.1985).

In *Estelle,* the Court ruled that deliberate indifference can be manifested by a doctor's refusal to administer needed treatment, a prison guard's intentional denial or delay in granting an inmate access to medical care, or his intentional interference with prescribed treatment. *Estelle,* 429 U.S. at 104–05, 97 S.Ct. at 291–92. The Second Circuit has articulated its interpretation of *Estelle's* deliberate indifference standard. In *Todaro v. Ward,* 431 F.Supp. 1129 (S.D. N.Y.1977), *aff'd,* 565 F.2d 48 (2d Cir.1977), Judge Ward ruled that there are two categories of deliberate indifference: denied or unreasonably delayed access to a physician for diagnosis and treatment and failure to administer treatment prescribed by a physician. *Todaro,* 431 F.Supp. at 1132–33. In

affirming, the Second Circuit stated that repeated examples of delayed or denied medical treatment bespeaks deliberate indifference by prison officials to the medical needs of the inmates. *Todaro,* 565 F.2d at 52. However, claims of medical malpractice or negligence on the part of the prison doctor, *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976); *Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir.1972), disagreement with the doctor's professional judgment about proper treatment, *Hyde v. McGinnis,* 429 F.2d 864, 866–67 (2d Cir.1970), and accidents, *Estelle,* 429 U.S. at 105, 97 S.Ct. at 291, do not rise to the level of deliberate indifference.

Turning to the second prong of the Eighth Amendment standard, a prisoner must show that the medical needs to which prison officials were deliberately indifferent were serious. In *Todaro,* Judge Ward ruled that a serious medical need can be one which "although not life threatening or likely to result in permanent disability, cause[s] discomfort." 431 F.Supp. at 1132–33. In affirming, the Second Circuit found that medical conditions which cause or perpetuate pain constitute serious medical needs. *Todaro v. Ward,* 565 F.2d 48, 52 (2d Cir.1977).

Finally, since plaintiffs challenge as unconstitutional the system for the delivery of dental services at Bedford Hills and not merely the dental care provided to one inmate, they must prove "a pattern of conduct amounting to deliberate indifference to [dental] needs of prisoners." *Bishop v. Stoneman,* 508 F.2d 1224, 1226 (2d Cir. 1974). They may prove such a pattern by demonstrating a series of incidents of deliberate indifference closely related in time to one another. *Id.* In *Todaro v. Ward,* the Second Circuit spoke of "repeated examples" of inadequate medical treatment as bespeaking systemwide deliberate indifference. 565 F.2d 48, 52 (2d Cir.1977).

Thus, to demonstrate a substantial likelihood of success on their claim that the provision of dental services at Bedford Hills is unconstitutional, plaintiffs must make a strong showing that defendants

denied inmates access to the dentist for diagnosis and treatment or failed to provide prescribed treatment, resulting in pain, discomfort, or damage to the health of prison inmates. They also must show that incidents of failure to care for serious needs were not isolated events, but were part of a pattern of inadequate dental care.

B. *Eighth Amendment Standard Applied to Bedford Hills*

1. *Deliberate Indifference*

■ The evidence adduced at the hearing satisfies the Court that there is a substantial likelihood that plaintiffs will succeed in showing that defendants are deliberately indifferent to inmates' dental needs. Plaintiffs proved many incidents of delay in or denial of access to the dentist as well as numerous occasions in which prescribed treatment was not given. Two inmates, for example, have never seen the dentist, although they have often requested treatment. Numerous inmates have waited a year or more for their requests to see the dentist fulfilled. And still others have been diagnosed but have waited six months or more for treatment. Each of these delays represents an instance of deliberate indifference to inmates' dental needs.

The defendants argue that although they knew about the inmates' dental needs, they are not deliberately indifferent to them because they do provide treatment to inmates, they have made and are making efforts to improve care at Bedford Hills, and they currently plan to expand the dental facilities at Bedford Hills. In essence, they argue that their good faith in dealing with the provision of dental care at Bedford Hills precludes a finding of deliberate indifference. The relevant case law does not support defendants' position. Deliberate indifference can be proved by showing a prison official's mental state. But deliberate indifference is also a standard for measuring the adequacy of prison officials' responses to the known medical needs of inmates and their system for allowing inmates to make their needs known. While intentional or reckless denial of treatment

may constitute deliberate indifference, denial of treatment regardless of mental state can also constitute deliberate indifference. When prison officials are aware of inmates' dental needs they must not deny—intentionally or otherwise—care to them. This is established in the various formulations of the deliberate indifference standard. Judge Weinfeld, for example, stated that deliberate indifference can be shown by intentional efforts to delay access to treatment, complete denial of treatment, or reckless or callous indifference to the safety of prisoners. *Harding v. Kuhlmann*, 588 F.Supp. 1315, 1316 (S.D.N.Y.1984), aff'd, 762 F.2d 990 (2d Cir.1985). Judge Ward, in summarizing the law of deliberate indifference, stated "to prove a . . . . claim of unconstitutional denial of medical care it is necessary to show either denied or unreasonably delayed access to a physician for diagnosis or treatment of a discomfort causing ailment, or failure to provide prescribed treatment." *Todaro v. Ward*, 431 F.Supp. 1129, 1133 (S.D.N.Y.1977), aff'd, 565 F.2d 48 (2d Cir.1977).

The defendants next argue that the delays in providing care are not unconstitutional. They rely on *Chapman v. Rhodes*, 434 F.Supp. 1007 (S.D.Ohio 1977), aff'd, 624 F.2d 1099 (6th Cir.1980), rev., 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), in which the lower court found that substantial backlogs in the provision of dental services—including delays in pulling teeth, providing dentures, and filling cavities—developed before a full-time dentist was hired and one year later after he left. The court stated that the delays were intolerable, but found that they were only temporary, and the evidence before the court showed all dental needs were then being met. The court never actually ruled on the constitutionality of dental services because it was not relevant to the ultimate issue in the case—the constitutionality of double celling.

The Supreme Court, which only dealt with the constitutionality of double celling, mentioned that while a turnover in dental staff had caused a temporary but substan-

tial backlog, the evidence showed that the dental staff was treating emergencies. *Chapman*, 452 U.S. at 342, n. 6, 101 S.Ct. at 2397 n. 6. The evidence indicates that the dental staff at Bedford Hills does not treat emergencies and that the backlog is not temporary. Moreover, *Chapman* does not stand for the proposition that substantial delays in the provision of dental care are not unconstitutional. Furthermore, the consideration of dental care was dicta in both the district court and the Supreme Court, as the real issue was double celling. And if any guidelines emerge from *Chapman*, they are that temporary delays are not unconstitutional, as long as a dental clinic is presently providing dental care, and that a prison should not be subject to injunctive relief for past problems in the provision of dental services.

In the present case, although the backlogs developed near the end of Dr. Collings' tenure and became greater in the gap between Dr. Collings' exodus and Dr. Sherman's arrival, the backlogs at Bedford Hills continue and have grown. Dr. Sherman admitted that he is three months behind in treating requests for emergency treatment, and as the record indicates, patients who signed up for treatment with Dr. Sherman are still waiting to see him for diagnosis or treatment.

Defendants attempt to rely on other cases that deal directly with delays in the provision of dental services. In *Robbins v. South*, 595 F.Supp. 785 (D.Mont.1984), plaintiff alleged that prison officials ignored plaintiff's written requests for treatment for his infected gums and missing upper dental plate for three months before treating him. Finding no allegations that the treatment was intentionally delayed, the court ruled that a three month delay in the provision of treatment does not rise to the level of a constitutional violation.

This, however is not the law in this Circuit, which requires a finding of deliberate indifference if an inmate who has made his needs known to prison officials waits for three months, with a serious dental need and in pain, for dental treatment. In *Wil-liams v. Scully*, 552 F.Supp. 431 (S.D.N.Y. 1982), for example, the court found that plaintiff stated a claim for relief by claiming that he lost a filling in one of his teeth, waited over five months for the tooth to be refilled, suffered through a painful infection that developed in the tooth, and eventually lost it. *Id.* at 432. *Robbins* is also distinguished from the instant case, as three months at Bedford Hills is actually a relatively short waiting period. Indeed, inmates at Bedford Hills often wait for over a year before seeing a dentist, and even longer before receiving treatment.

The defendants also claim that because many patients eventually see the dentist and eventually receive treatment, there is no deliberate indifference. A number of courts have found that visits to the doctor preclude a finding of deliberate indifference. In *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), where plaintiff claimed that the prison officials violated his Eighth Amendment right to medical attention, the Supreme Court held that plaintiff failed to state a claim of deliberate indifference since he was seen by the doctor seventeen times in three months and was diagnosed and treated during that time. The plaintiff's disagreement was only with the type of treatment given. *Id.* at 107, 97 S.Ct. at 292.

Similarly, in *Shaffer v. McWilliams*, 570 F.Supp. 1422 (W.D.N.Y.1983), plaintiff had two teeth extracted and sued the prison dentist because he refused to prescribe a painkiller stronger than liquid Tylenol. The plaintiff was seen for treatment of her pain eight times in three days. The court, while stating that medical attention of that frequency is not consistent with a finding of deliberate indifference, also held that the case only involved a prisoner's disagreement with her doctor's treatment, and such a disagreement did not constitute a constitutional violation. In both *Shaffer* and *Williams*, the courts indicated that patients visited the dentist and actually received treatment. Even if prison officials give inmates access to treatment, they may still be deliberately indifferent to inmates'

needs if they fail to provide prescribed treatment. *Todaro v. Ward,* 431 F.Supp. at 1132–33. The record indicates that even when inmates have access to the dentist at Bedford Hills they often do not receive treatment.

### 2. *Serious Dental Needs*

The Court finds that the plaintiffs have demonstrated a substantial likelihood of success on their claim that the dental needs to which the defendants are deliberately indifferent are serious, except insofar as they relate to prophylactic care. The record indicates that inmates do not suffer pain as a direct result of failure to provide prophylactic care and that failure to give prophylactic care to teeth will rarely lead to serious problems, although periodontal disease might develop. This conclusion is contrary to *Barnes v. Virgin Islands,* 415 F.Supp. 1218 (D.V.I.1976), where the Court stated that prisoners are entitled to curative and preventive dental work. *Id.* at 1235. But a prisoner is entitled to treatment only for conditions that cause pain, discomfort, or threat to good health, not treatment to ward off such conditions. Although preventive dentistry would probably save the clinic time in the long run, the Constitution does not require wise dentistry, only dentistry which responds to inmates' pain and discomfort.

Inmates' other dental needs—for fillings, crowns, and the like—are serious medical needs as the law defines that term. Inmates needing these services testified that they suffered from pain and discomfort. In addition to pain, many inmates suffered serious health consequences as a result of the defendants' failure to treat them. One inmate, for example, lost a tooth that could have been saved with prompt attention, and another lost fifteen pounds while awaiting dentures. The record indicates that while inmates with serious medical needs often requested treatment they did not receive it.

### 3. *Institutional Violation*

Finally, the Court finds that there is a substantial likelihood that deliberate indif-

ference to inmates' serious dental needs at Bedford Hills is systemwide. In *Bishop v. Stoneman,* 508 F.2d 1224 (2d Cir.1974), the Court found that six incidents of delay or denial of medical treatment was sufficient to state a claim for systemwide relief. *Id.* 1225–26. Plaintiffs here have shown many more than six instances of inadequate care. And more importantly, they have demonstrated that the cases of inadequate care are directly linked to defendants' policy of ignoring inmates' requests for routine care, waiting for months before responding to requests for emergency care, and rarely keeping follow-up appointments. Their failure to respond to requests for emergency treatment and routine care, and to perform follow-up appointments denies the defendants access to the dentist for treatment and diagnosis, and thus constitutes deliberate indifference on an institutional scale.

■ However, the defendants' failure to do prompt initial examinations does not, in and of itself, rise to the level of a constitutional violation. The Eighth Amendment does not entitle inmates to an initial screening. The deliberate indifference standard does not require prison officials to seek out patients for treatment. The prison must provide inmates with a procedure for making their needs known and must provide services to inmates who need them, but the burden is on the prisoner to make the needs known. For example, in *Church v. Hegstrom,* 416 F.2d 449 (2d Cir.1969), the court stated that a complaint which alleged only that a prison attendant observed that the plaintiff looked ill, but did not allege that the defendants knew he was ill or that he required treatment, did not state a violation. Although this case was decided before *Estelle,* more recent formulations of the deliberate indifference standard indicate that prison officials cannot be liable unless they knew of an inmate's medical needs or had some reason to believe they might be serious. *See Harding v. Kuhlmann,* 588 F.Supp. 1315 (S.D.N.Y.1984) (deliberate indifference can be shown by intentional efforts to delay access, com-

plete denial of treatment, or reckless or callous indifference to the safety of the prisoner); *Williams v. Director of Health Services*, 542 F.Supp. 883 (S.D.N.Y.1982) (deliberate and callous disregard for inmate's request for treatment). Although the failure to conduct prompt initial screening examinations may be inefficient prison administration, it is not unconstitutional. *See Chapman v. Rhodes*, 434 F.Supp. 1007, 1016 (S.D.Ohio 1977), *aff'd*, 624 F.2d 1099 (6th Cir.1980), *rev. in other part*, 452 U.S. 337, 344, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981) (failure of dental clinic to formulate individual treatment plans for dental patients is not unconstitutional).

## II. *Irreparable Harm*

A party seeking a preliminary injunction must also show irreparable harm. Plaintiffs in this case have made such a showing. Inmates at Bedford Hills are suffering from pain, loss of teeth, discomfort, weight loss, and infection. All are forms of irreparable harm. *See Lee v. McManus*, 543 F.Supp. 386, 392 (D.Kan.1982) (pain, anxiety, discomfort, and life-threatening complications are the type of irreparable harm which can justify a preliminary injunction). The defendant's remedial efforts have not defeated or remedied the irreparable harm.

## REMEDY

Based on the above findings of fact and conclusions of law, the Court must issue a preliminary injunction ordering the defendants to provide adequate dental care to inmates with serious dental needs. Specifically, the defendants are hereby ORDERED to provide a dental access system that assures prompt diagnosis and treatment for inmates with serious dental needs, provide a system that assures that follow-up care is provided as ordered and without delay, and take prompt steps to eliminate expeditiously the current backlogs in treatment. Defendants are furthermore ORDERED to take all steps necessary to comply with the terms of this order.

The Court will not now be more specific regarding the terms of the injunction. It expects the defendant and plaintiffs to work out terms for compliance with the injunction in the first instance.

SO ORDERED.